## UNITED STATES ET AL. *v.* PENNSYLVANIA RAILROAD CO. ET AL.

NO. 47.

Argued January 8, 9, 1945.—Decided January 29, 1945.

*Mr. Daniel W. Knowlton,* with whom *Solicitor General Fahy, Assistant Attorney General Berge, Messrs. Walter J. Cummings, Jr., Edward M. Reidy* and *Robert L. Pierce* were on the brief, for the United States and the Interstate Commerce Commission, and *Mr. Parker Mc-Collester,* with whom *Messrs. James D. Carpenter, Jr., H. H. Larimore, Duane E. Minard* and *Arthur T. Vanderbilt* were on the brief, for Forrest S. Smith, Trustee, et al., appellants in No. 47 and appellees in No. 48.

*Mr. John Vance Hewitt,* with whom *Messrs. John A. Hartpence, Joseph F. Eshelman, R. Aubrey Bogley, David Asch, Charles Clark, Frank W. Gwathmey, Henry A. Jones, G. H. Muckley, J. P. Plunkett, Edward W. Wheeler* and *D. Lynch Younger* were on the brief, for the Pennsylvania Railroad Co. et al., appellees in No. 47 and appellants in No. 48.

MR. JUSTICE BLACK delivered the opinion of the Court.

Seatrain Lines, Inc., is a common carrier of goods by water. In 1929, its predecessor began to carry goods from Belle Chasse, Louisiana, to Havana, Cuba. Each of the vessels used was so constructed that it could carry a number of railroad cars, and special equipment was provided to hoist these cars from adjacent tracks on the docks and move them bodily into the vessels. It was thereby rendered unnecessary for goods carried to the ports in railroad cars to be unloaded from the cars and carried piecemeal into the vessels. This new method of transportation, so the Interstate Commerce Commission has found, was a great improvement over the old practice, less destructive to the goods, more economical and more efficient. 226 I. C. C. 7, 20–21. In 1932, Seatrain decided to initiate a new interstate service between Hoboken, N. J. and Belle Chasse, Louisiana, via Havana, Cuba, and thus entered into direct competition with the interstate transportation of freight by railroads. During the time Seatrain had limited its business to foreign transportation, i. e., Louisiana to Cuba, the non-competing railroads freely permitted it the use of their cars. Shortly after it began its interstate service, however, the following rule was promulgated by the American Railway Association:[1]  "Cars

---

[1] Later the American Railway Association and other railroad organizations consolidated their activities under the name of the Association of American Railroads. The new Association adopted the same rule.

of railway ownership must not be delivered to a steamship, ferry or barge line for water transportation without permission of the owner filed with the Car Service Division." Thereafter, some railroads continued to permit Seatrain to use their cars but others, including the parties to this proceeding, refused to do so. No railroads "refused to permit delivery of their cars to any of the other eleven water lines listed in a circular of the Association as coming within the intendment of the rule." 206 I. C. C. 328, 337.

A complaint was filed with the Interstate Commerce Commission. Appropriate hearings were conducted and a series of findings and opinions were entered. The findings were that the sole object of the Association of Railroads' rule was to prevent diversion of traffic from the railroads to Seatrain; that Seatrain, as an interstate water carrier, was subject to the Commission's jurisdiction; that its interstate operations were in the public interest and of advantage to the convenience and commerce of the public; that the Commission had jurisdiction to require through rail-water interstate routes, and, where such through routes were established, to require railroads to interchange cars with water carriers, 195 I. C. C. 215; 206 I. C. C. 328. An initial order of the Commission required the railroads to establish certain through joint rail-water routes with Seatrain. Such through interstate routes together with joint rates were established. 226 I. C. C. 7; 243 I. C. C. 199. The Commission then heard evidence and found that a payment of $1.00 per day would be a reasonable amount for Seatrain to pay the railroads for their cars while they were in Seatrain's possession. 237 I. C. C. 97; 248 I. C. C. 109. Based on its findings the Commission ordered the railroads to abstain from observing and enforcing rules and practices which prohibited the interchange of their freight cars for transportation by Seatrain in interstate commerce.

The railroads promptly brought this action under 28 U. S. C. 41 (28), 47, to set aside the Commission's order. The District Court set aside the order insofar as it required railroads to interchange cars destined for carriage by Seatrain outside the territorial waters of the United States, but sustained it in all other respects. 55 F. Supp. 473. Both sides appealed directly to this Court as authorized by the Urgent Deficiencies Act of October 22, 1913, 28 U. S. C. 47, 47a, and § 238 of the Judicial Code, 28 U. S. C. 345, par. (4).

*First.* It is contended that the railroads are under no duty to deliver their cars to Seatrain and that the Interstate Commerce Commission is without authority to require them to do so. It has long been held, and it is not denied here, that since the passage of the Interstate Commerce Act, railroads may be compelled to establish through routes [2] and to interchange their cars with each other,[3] both subject to reasonable terms. Nor is it denied that the railroads are under a legal duty, enforceable by proper Commission orders, to establish through routes with connecting water carriers.[4] The narrow contention is that the power granted the Commission to require the establishment and operation of through rail-water routes does not empower it to require a railroad to interchange its cars with a water carrier. Since the Commission's order was entered after passage of the 1940 Transportation Act,

---

[2] *St. Louis S. W. R. Co.* v. *United States,* 245 U. S. 136, 142–144.

[3] Missouri & Illinois Coal Co. v. Illinois Central R. Co., 22 I. C. C. 39, 44; *Chicago, R. I. & P. R. Co.* v. *United States,* 284 U. S. 80, 91, 101–102; cf. *St. Louis, S. W. R. Co.* v. *Arkansas,* 217 U. S. 136, 145–146.

[4] Such has long been the ruling of the Interstate Commerce Commission. Chattanooga Packet Co. v. Illinois Central R. Co., 33 I. C. C. 384, 391–392; Flour City S. S. Co. v. Lehigh Valley R. Co., 24 I. C. C. 179; Decatur Navigation Co. v. L. & N. R. Co., 31 I. C. C. 281, 288; Pacific Navigation Co. v. Southern Pacific Co., 31 I. C. C. 472, 479.

54 Stat. 898, the question must be decided under that Act. *Ziffrin, Inc.* v. *United States,* 318 U. S. 73, 78.

There is no language in the present Act which specifically commands that railroads must interchange their cars with connecting water lines. We cannot agree with the contention that the absence of specific language indicates a purpose of Congress not to require such an interchange. True, Congress has specified with precise language some obligations which railroads must assume. But all legislation dealing with this problem since the first Act in 1887, 24 Stat. 379, has contained broad language to indicate the scope of the law. The very complexities of the subject have necessarily caused Congress to cast its regulatory provisions in general terms. Congress has, in general, left the contents of these terms to be spelled out in particular cases by administrative and judicial action, and in the light of the Congressional purpose to foster an efficient and fair national transportation system. Cf. *Chicago, R. I. & P. R. Co.* v. *United States,* 274 U. S. 29, 36; *Interstate Commerce Commission* v. *Railway Labor Executives Assn.,* 315 U. S. 373, 376–377.

The 1940 Transportation Act is divided into three parts, the first relating to railroads, the second to motor vehicles, and the third to water carriers. That Act, as had each previous amendment of the original 1887 Act, expanded the scope of regulation in this field and correlatively broadened the Commission's powers. The interrelationship of the three parts of the Act was made manifest by its declaration of a "national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each." The declared objective was that of "developing, coordinating, and preserving a national transportation system by water, highway, and rail, . . . adequate to meet the needs of the commerce of the

United States . . ." Congress further admonished that "all of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." 54 Stat. 899.

This policy cannot be carried out as to Seatrain's interstate carriage unless railroads interchange their cars with it. The particular type of service introduced by Seatrain, and found by the Commission to be qualitatively superior, cannot be rendered without the privilege of carrying the very railroad cars which carry freight to its ports. The "inherent advantages of this service" would be lost to the public without railroad car interchange.

Furthermore, the Act calls for "fair and impartial regulation." The railroad Association's rule however is constructed on the premise that the railroads can at their discretion determine which water carrier may, and which may not, transport their cars. Seatrain alone, of all the water carriers, according to the Commission's findings, has been refused car interchange. This means that the Association's rule, if valid, enables the railroads to decline to deal with Seatrain as it does with other carriers. As early as 1914, the Commission had declared that the Interstate Commerce Act, as then in effect, prohibited railroad practices which lent themselves to such purpose. The Commission said at that time:

"If the rail carriers are permitted to choose the particular boat lines with which they will establish through routes and joint rates, they will be able to dictate who shall operate on the water and who shall not, for a boat line which is accorded a monopoly of the through rail-and-water traffic will soon be able to drive its competitors out of business." Pacific Navigation Co. *v.* Southern Pacific Co., 31 I. C. C. 472, 479.

We cannot agree with the contention that the Commission has less power now to protect water carriers than it

had in 1914.[5]   The 1940 Act was intended, together with
the old law, to provide a completely integrated interstate

[5] This argument rests on a historical analysis of provisions in the
original Act and later amendments which impose specific duties as to
car interchanges. A detailed and clear narrative of the history appears
in the opinion of the District Court. 55 F. Supp., *supra*, 479–483. In
summary the argument is this. The original 1887 Act applying only to
railroads, 24 Stat. 379, required in § 3, an "interchange of traffic" but
did not specifically provide for an interchange of cars. The Hepburn
Amendment of 1906, 34 Stat. 584, subjected water carriers to the Act
so far as they connected with railroads in interstate commerce, defined
transportation to include "cars" and "facilities," and made it the duty
of railroads to establish through routes. The Mann-Elkins Amend-
ment of 1910, 36 Stat. 539, 545, required carriers to make reasonable
rules and regulations to provide for "exchange, interchange, and return
of cars" used on through routes. The Esch Car Service Act of 1917,
40 Stat. 101, again required interchange of cars, and specifically gave
the Commission power to establish rules to enforce the requirement.
The Transportation Act of 1920, 41 Stat. 456, 476, omitted the exact
language of the car interchange requirement which had appeared
in the 1910 Mann-Elkins Amendment, but substituted for it §§ 1 (10)
(11) (13) and (14) which contained more elaborate language im-
posing still more specific duties in this respect. These "car service"
provisions were not changed by the 1940 Transportation Act. The
Mann-Elkins and the Esch Car Service Amendments, however, had
made the car interchange provisions applicable to every "carrier sub-
ject to the provisions of this Act." The 1920 Act made the car service
provisions applicable to "carriers by railroad subject to this Act";
the 1940 Act made them applicable to a "carrier by railroad subject
to this part." The argument is that these changes, made in the 1920
and carried into the 1940 Act, show a continuing purpose of Congress
to deprive the Commission of the power to require interchange of cars
with water carriers—to detract from its authority. But we have
already had occasion to say that the 1920 Act "materially extends the
jurisdiction of the Commission in respect of land and water transpor-
tation and the carriers engaged in it, whenever property may be or is
transported in interstate commerce by rail and water by a common
carrier or carriers . . ." *Chicago, R. I. & P. R. Co.* v. *United States,*
274 U. S. 29, 35. This conclusion as to the scope of the 1920 Act is
fully justified by its history, 206 I. C. C. *supra,* 339–343. Conse-
quently, the 1920 changes in the language of the car service require-
ments do not justify the narrow interpretation of the 1940 Act which
is here urged.

regulatory system over motor, railroad, and water carriers. In the light of its declared policy, and because of its provisions hereafter noted, we think railroads are under a duty to provide interchange of cars with water carriers to the end that interstate commerce may move without interruption or delay. Cf. Flour City S. S. Co. *v.* Lehigh Valley R. Co., 24 I. C. C. 179, 184.

Sec. 1 (4) of Part I of the Act imposes a duty on railroads to establish reasonable through routes with other carriers, including water carriers, and to "provide reasonable facilities for operating such routes" [6] under "reasonable rules and regulations."

Sec. 3 (4) makes it the duty of railroads to "afford all reasonable, proper, and equal facilities for the interchange of traffic between their . . . lines and connecting lines, and for the . . . forwarding . . . of . . . property to and from connecting lines," and a "connecting line" is defined to include a water carrier.

Sec. 15 (3) supplements these sections by providing that the Commission may hold hearings, and "shall," if it deems it "necessary or desirable in the public interest, . . . establish through routes . . . and the terms and conditions under which such through routes shall be operated."

These sections provide sufficient authorization for the Commission's order. It was from its power to require through routes that the Commission originally derived its power to require interchange of railroad cars among connecting railroads.[7] Since a rail-water through route with Seatrain cannot function without an interchange of cars, the unquestioned power of the Commission to require establishment of such routes would be wholly fruitless, without the correlative power to abrogate the Association's rule which prohibits the interchange.

---

[6] As to cars being "facilities," see § 1 (3) (a) of the Act, and *Assigned Car Cases*, 274 U. S. 564, 575, 580; *General American Tank Car Corp.* v. *El Dorado Terminal Co.*, 308 U. S. 422, 428.

[7] See note 3.

*Second.* It is contended, and the court below held, that if the Commission has power to require railroads to interchange cars with through route connecting water carriers, it is without power to do so if a route traverses, in part, foreign waters, as Seatrain's does. This contention basically rests on paragraphs (1) and (2) of § 1 of the Interstate Commerce Act, as amended by § 400 of the 1920 Act, 41 Stat. 474, left unchanged by Part I of the 1940 Act. The language relied upon in these paragraphs declares that the provisions of Part I, relating to railroads and their transportation, shall apply "only insofar as such transportation . . . takes place within the United States." Limiting language to the same effect is contained in the water carrier regulatory provisions of Part III of the 1940 Act.[8]

This Court has stated that the 1920 Act, containing this limiting clause, "applies to international commerce only in so far as the transportation takes place within the United States." *Lewis-Simas-Jones Co.* v. *Southern Pacific Co.,* 283 U. S. 654, 660. The question in that case was as to joint through railroad rates over a railroad route partly in the United States and partly in Mexico. The Court further said as to this situation that "The Act does not empower the Commission to prescribe or regulate such rates."[9] In *St. Louis, B. & M. R. Co.* v. *Brownsville District,* 304 U. S. 295, this Court was called upon to consider

[8] Sec. 302 (i) (2) of the Act provides that the transportation subject to regulation is that ". . . partly by water and partly by railroad or motor vehicle, from a place in the State to a place in any other State; except that with respect to such transportation taking place partly in the United States and partly outside thereof, such terms shall include transportation by railroad or motor vehicle only insofar as it takes place within the United States . . ."

[9] Notwithstanding this, however, the Court held that where such joint rates were voluntarily fixed and charged by an American railroad, the Commission could, under the power given it by the 1920 Act, pass upon the reasonableness of the joint international rate.

whether, under the 1920 Act, there was a duty on the part of American railroads to furnish cars for transportation on a Mexican railroad. It was there held that in the absence of a discrimination against shippers, places, or classes of traffic within the United States, American railroads were "not bound by any law, regulation, or tariff to furnish cars for transportation in Mexico." These decisions simply meant that whatever power Congress might have to regulate the conduct of its domestic companies doing business abroad,[10] it had, by the limiting provisions of the 1920 Act, expressed its purpose not to empower the Commission with general authority to regulate rail transportation in foreign countries.

But these interpretations of the 1920 Act concerning rail transportation outside the United States are of dubious relevance to the instant case. For Congress has, in § 15 (3) of the 1940 Act, unequivocally granted to the Commission the power to establish through joint rail-water routes, and § 302 (i) (2) makes this power applicable to such routes "from a place in the United States to another place in the United States."[11] Cf. *Cornell Steamboat Co.* v. *United States,* 321 U. S. 634. The reason for this grant of authority to the Commission is apparent. It is well known that a substantial part of intercoastal and lake transportation among the states, in which American companies engage, traverses waters outside of the territorial limits of the United States. Foreign countries have not the same interest in this purely domestic carriage of goods as they have in controlling the movement of rail-

---

[10] See *Knott* v. *Botany Mills,* 179 U. S. 69; *Cunard S. S. Co.* v. *Mellon,* 262 U. S. 100, 129.

[11] The Commission denied Seatrain's petition insofar as it asked an order requiring railroads to interchange their cars for the purpose of handling freight to Cuba. 206 I. C. C. *supra,* 337; 248 I. C. C. *supra,* 118–119.

roads in their territory.[12]  Such transportation must be regulated by this country if it is to be effectively regulated. Congress recognized this fact when it made special provision in § 15 (3) for the Commission to regulate water transportation from one to another place in the United States, even though that transportation took place "partly outside" the United States.  It is this particular provision, made especially applicable to interstate *rail-water* transportation, by which the Commission's authority over such movements must be measured, rather than by the limiting clause of § 1, which is applicable to the Commission's power over *railroad* transportation.  There is therefore nothing in the Act to deny the Commission the same power over interstate water-rail transportation which passes through foreign waters, as we have just held it enjoys where the transit is wholly within the territorial limits of the United States.  We therefore hold that the order of the Commission requiring car interchanges was within its authority as to interstate movements which take place within or without the territorial waters of the United States.[13]

---

[12] Section 1 (1) (a) of Part I of the Act which contains the general clause limiting the Act's application to railroad transportation within the United States, also declares its application to transportation "from any place in the United States *through a foreign country* to any other place in the United States."  This latter clause, as the District Court recognized, 55 F. Supp. *supra*, 487, would have little meaning, if the limiting clause were given the interpretation for which the railroads here contend.

[13] We have not overlooked the argument that Congress intended to take away part of the Commission's power over car interchanges by repealing subdivision (b) of § 6 (13) of the Act to Regulate Commerce as amended, 37 Stat. 560, 568, which reads as follows: "To establish through routes and maximum joint rates between and over such rail and water lines, and to determine all the terms and conditions under which such lines shall be operated in the handling of the traffic embraced."

This repealed provision was substantially embodied in 15 (3) of the 1940 Act.  We think Commissioner Eastman, then Chairman of

*Third.* The Commission found that $1.00 per car per day, to be paid to the car owners while Seatrain actually had cars in its possession, was a reasonable compensation. Although, in practice, cars brought to the ports must sometimes wait several days for Seatrain's sailing, the Commission did not require Seatrain to make per diem payments during this waiting period. It is contended that the Commission should require Seatrain to pay for the cars from the time they are made available to it; that the rate of compensation was too low; and that in both respects, the result is to require railroads to afford Seatrain the "free use" of their property, thereby imposing a burden upon the railroads which Congress neither did nor could have authorized. *Chicago, R. I. & P. R. Co.* v. *United States,* 284 U. S. 80, 97.

The questions thus raised depend upon a determination of facts. The findings of the Commission, discussed at length in its opinions, illustrate the complex nature of the facts involved. 237 I. C. C. 97, 101–102; 248 I. C. C. 109. Those facts need not be repeated here. The Commission not only had the benefit of the testimony offered in these proceedings, but was possessed of wide experience with the general problem of car hire. See e. g. Rules for Car-Hire Settlement, 160 I. C. C. 369. We have carefully examined the record and find substantial evidentiary support for the Commission's finding "that the current code of per diem rules governing the interchange of freight cars between the defendants above referred to and other rail carriers, including the current rate of $1 per day payable by Seatrain for such period as the cars are in its actual

---

the Legislative Bureau, made an accurate statement when, in writing the Senate-House Conference Committee considering the 1940 Act, he stated that he did not object to the repeal of 13 (b) since "Other provisions of the bill adequately cover this matter." Omnibus Transportation Legislation, House Committee Print, 76th Congress, 3d Session, p. 23.

possession, would be reasonable for application to the interchange of cars between defendants and complainants for use by Seatrain." 248 I. C. C. at 119. This being true we sustain the Commission's order in this respect.[14]

We find no merit in any of the other contentions raised against the order of the Commission.

The judgment in No. 47 is reversed, and the judgment in No. 48 is affirmed.

*It is so ordered.*

MR. JUSTICE ROBERTS dissents.

---

[14] It is to be noted that the Commission has not foreclosed future consideration of the car hire compensation problem, insofar as it may be involved in determining railroad rates or a proper division of through rail-water rates between Seatrain and the railroads. 248 I. C. C. 117; cf. *Chicago, R. I. & P. R. Co.* v. *United States, supra,* 97, 109, note 11.