**CANADIAN PACIFIC LIMITED, and Canadian National Railway Company, Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

**Atchison, Topeka & Santa Fe Railway Company et al., Intervening Defendants.**

**Civ. A. No. 1193-73.**

United States District Court, District of Columbia.

July 23, 1974.

John Guandolo, MacDonald & McInerny, Washington, D. C., for plaintiffs.

Thomas Kauper, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., John H. D. Wigger, Atty., Dept. of Justice, for defendant United States.

Fritz R. Kahn, Gen. Counsel, Hanford O'Hara, Atty., Washington, D. C., for

defendant Interstate Commerce Commission.

Harvey Huston, Don McDevitt, Chicago, Ill., Byron D. Olsen, St. Paul, Minn., Martin Sterenbuch, Cake & Sterenbuch, Washington, D. C., for intervening defendants.

Before WILKEY, Circuit Judge, and ROBINSON and FLANNERY, District Judges.

## OPINION

AUBREY E. ROBINSON, Jr., District Judge.

This is an action for review of Orders of the Interstate Commerce Commission entered in a proceeding styled Investigation and Suspension Docket No. 8528, Allowances on Controlled Shipments of Potash, Canada to U.S., reported at 337 I.C.C. 769 (1970). Jurisdiction is founded on 28 U.S.C. § 1336. The matter is before a three-judge court as required by 28 U.S.C. § 2325.

By schedules issued December 1, 1969, to become effective January 1, 1970, plaintiffs proposed to introduce an "incentive allowance" modifying existing rates on prepaid shipments of potash from points in Saskatchewan, Canada, to points in the United States, subject to certain conditions. The general purpose of the proposed allowance was to encourage Canadian shippers of potash to evenly distribute their shipments throughout the year and thus alleviate a shortage of hopper cars during the peak potash shipping periods [1] and to provide better year-round utilization of such cars.[2] Plaintiffs filed their proposed new schedule with the Interstate Commerce Commission "for information only" on or about December 1, 1969. On

---

1. The primary use of potash is as an agricultural fertilizer. The peak demand, and consequently peak shipping periods, were therefore the early spring and fall months, coinciding with the planting seasons.

2. Canadian railroads use certain covered hopper cars for the shipment of potash only. American railroads, on the other hand, use such cars for other cargo as well, principally

grain, when they are not in demand for potash shipments. The cars are not suitable for transportation of grain in Canada because most grain-loading and unloading facilities in Western Canada are designed only for box car traffic. This diverse practice is apparently one of the reasons for the divergence of interests between the Canadian and American railroads herein.

December 29, 1969, after receiving protests from certain American railroads, the Intervening Defendants herein, the Commission entered an Order suspending the operation of the proposed schedules until July 31, 1970, and instituting an investigation as to their lawfulness. That Order noted that "there is reason to believe that (the proposed schedules) would, if permitted to become effective, result in rates and charges . . . which would be unjust and unreasonable . . . in violation of the Interstate Commerce Act."[3] Thereafter, by Report and Order issued October 23, 1970, the Commission, by Division 2, found that the proposed allowances were "inextricably tied to the joint through international rate."[4] As such, the Commission held, the schedules were improperly filed without the assent of the American parties to the joint through rate, in violation of Section 6(4) of the Interstate Commerce Act.[5] The proposed schedules were therefore ordered stricken from the files of the Commission. On February 15, 1973, the full Commission entered an Order affirming the Order of Division 2 entered October 23, 1970. Both Division 2 and the full Commission premised their decisions solely on the filing requirements for joint rates under Section 6(4), making no findings on the reasonableness of the proposed allowances or the economic justification therefor. Following expiration of the Order of Suspension on July 31, 1970,

Plaintiffs voluntarily postponed the effective date of the proposed schedules throughout the course of proceedings before the Commission and this Court. Plaintiffs now seek to have this Court enjoin and set aside the Orders herein which struck the proposed schedules from the Commission's files.[6]

Plaintiffs have vigorously contested the jurisdiction of the Commission over the proposed schedules throughout the proceedings herein. That jurisdiction is the central issue herein.

I. An issue raised by the Court at oral argument herein warrants brief discussion. That is the question of whether this case is presently ripe for judicial review. Plaintiffs contend that the proposed schedules are beyond the jurisdiction of the Commission and were filed "for information only." There is outstanding no Order of the Commission with regard to the proposed schedules other than the Orders striking them from I.C.C. files. If Plaintiffs' position on jurisdiction is correct, the absence of the schedules from I.C.C. files is of no consequence. Plaintiffs are free to implement the proposed schedules. This Court has no guarantee that the schedules will in fact be implemented if the Court rules for Plaintiffs, nor that the Commission would attempt any enforcement or punitive action against Plaintiffs if the proposed schedules are implemented. In these circumstances the

3. Order of the Interstate Commerce Commission, Board of Suspension, December 29, 1969, at 1. (Appendix 1 to Complaint.)

4. Report and Order of the Interstate Commerce Commission, Division 2, October 23, 1970, at 8. (Appendix 3 to Complaint). 337 I.C.C. 769, 775 (1970).

5. 49 U.S.C. § 6(4).

6. Plaintiffs' prayer for relief (¶ 3) asks that the Court set aside the Order entered December 29, 1969, the Report and Order entered October 23, 1970, and the Orders entered May 12, 1971, and February 15, 1973. The Order of December 29, 1969, suspended operation of the proposed schedules until July 31, 1970, and directed an investigation

of the proposed schedules. The suspension period has passed and there is no indication in the present record that it was extended or renewed by the Commission. The investigation has been terminated. The December 29, 1969 Order is therefore moot. It will not be reviewed herein. Likewise, the Order of May 12, 1971, merely denied reconsideration of the case by Division 2, and affirmed the striking of the schedules from the files. That Order was stayed, however, by the full Commission (June 21, 1971) and is of no consequence. It is the Report and Order of Division 2, October 23, 1970, and the Final Order of the full Commission affirming Division 2, February 15, 1973, which may have substantive effects and are the proper subjects of review herein.

Court must examine whether the Commission's Orders herein are ripe for review.

■ In the present case the full Interstate Commerce Commission has ruled after extensive litigation that it does have jurisdiction over the tariff schedules here disputed. Plaintiffs have been put on notice by the Orders striking these tariffs from I.C.C. files that the Commission regards the tariffs as improper. In these circumstances Plaintiffs do not face merely a generalized declaration by the Commission that it will do its duty to enforce the law, but a more particularized peril. The attention of the Commission has focused on Plaintiffs' tariffs herein, the tariffs have been once suspended by Order of the Commission, and the central legal defense to allegations of their impropriety has already been ruled upon by the Commission adversely to Plaintiffs. We find that in these circumstances Plaintiffs are placed in an intolerable business position of acting at their peril. We find most analogous Frozen Food Express v. United States, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 730 (1956),[7] wherein an Order of the Interstate Commerce Commission was found reviewable despite the fact that it imposed no direct obligation on carriers but merely declared the Commission's view of a narrow point of law. The Supreme Court found that the challenged Order had "an immediate and practical impact on carriers" and was "the basis for carriers in ordering and arranging their affairs." Further, in Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) and Toilet Goods Assn. v. Gardner, 387 U.S. 158, 162–166, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967), the Supreme Court adopted and applied a two-fold test for ripeness, the fitness of the issues for judicial decision and the hardship to the parties of withholding Court consideration. As to fitness for judicial decision, the issue herein is essentially a legal question as to the scope of the Commission's jurisdiction. To the extent that factual matters are intertwined, e. g. the nature and effect of the proposed tariffs, these have already been the subject of an extensive administrative proceeding, the record of which is before the Court. As to the hardship to the parties of withholding decision, the crucial factor as framed by the Supreme Court appears to be whether "primary conduct is affected—(as) when contracts must be negotiated . . . ." 387 U.S. at 164, 87 S.Ct. at 1525. In the present case, if plaintiffs are to adopt the incentive rates allowance which they claim a right to do, shippers must be advised and must agree to properly space future shipments and otherwise qualify for the rates. The Court finds primary conduct affected herein and review appropriate.

II. Plaintiffs contend that the proposed tariff schedules are "local incentive allowance(s),"[8] operative only in Canada and subject to regulation only by the Canadian Transport Commission. Both plaintiffs and U.S. railroads are parties to Canadian Freight Association Tariff No. 228B, I.C.C. No. 183, which specifies the joint through international rates applicable to potash shipments from Saskatchewan to points in the United States. Plaintiffs contend that their proposed "local incentives" are unrelated to the joint through rate. The record discloses that the proposed schedules were filed as plaintiffs' individual schedules only, that the allowance provided in the schedules is payable to the Canadian producer-shipper in Canada in Canadian Funds and does not affect the rate paid by the receiver pursuant to the joint through international rate. United States railroads are not parties to the proposed schedules and, indeed, are ad-

---

7. *Compare* United States v. Los Angeles Railroad Co., 273 U.S. 299, 47 S.Ct. 413, 71 L.Ed. 651 (1927), wherein the Court found non-reviewable an I.C.C. "order" which was the report of an investigation and which might never be the basis of a further proceeding.

8. Plaintiffs' Brief, at 3.

verse to them. The Intervening Defendants, U.S. railroads, support the Commission's findings that the proposed allowances are in the nature of a rebate and inextricably intertwined with the joint through international rate. While plaintiffs choose to call the proposed allowances "local," it is clear that the allowances are not to be paid for shipments destined within Canada. Plaintiffs have not disclosed why the rationale for better utilization of hopper cars is not equally applicable to inter-Canadian shipments. There are no "local" rates applicable to shipments of potash from Canada to the United States. Only the joint through rate applies to such shipments. While the court does not here decide any question of sufficiency of evidence to support the Commission's Order, it is readily apparent that the Commission's conclusion that the proposed schedules are inextricably intertwined with the joint through international rate is not devoid of rational foundation. Even if we made such a finding, however, this would not of itself justify the Commission's exercise of jurisdiction herein.

III. Consideration of I.C.C.'s jurisdiction over the tariff schedules disputed herein must begin with Section 1(1) of the Interstate Commerce Act, 49 U.S. C. § 1(1), which as relevant here provides that rail carriers are subject to regulation if they engage in transportation "from or to any place in the United States to or from a foreign country, *but only insofar as such transportation . . . takes place within* the United States."[9] (emphasis added). Plaintiffs rely upon the limiting language empha-

sized above as the basis for their contention that the tariff schedules here in dispute are beyond the jurisdiction of the Commission because the tariffs by their terms apply only to transportation *in Canada* (albeit only on shipments bound for the United States.) The Commission relies primarily upon two recent Supreme Court decisions, Canada Packers v. Atchison, Topeka and Santa Fe Ry. Co., 385 U.S. 182, 87 S.Ct. 359, 17 L.Ed.2d 281 (1966) and H. K. Porter Co. v. Central Vermont Co., 366 U.S. 272, 81 S.Ct. 1341, 6 L.Ed.2d 284 (1961), for the proposition that it has "jurisdiction over joint international through rates"[10] and therefore jurisdiction over all aspects of those rates, including the tariffs here challenged. The Court finds the Commission's reading of *Canada Packers* and *H. K. Porter* far too broad and inconsistent with the express statutory limitations in the definition of I.C.C. jurisdiction.

In *Canada Packers,* a U.S. railroad had entered into a joint through international rate with Canadian railroads, which rate the Commission subsequently found to be unreasonable.

The Commission ordered the U.S. railroad to pay reparations in the full amount by which the joint rate exceeded a reasonable rate, considering both the Canadian and U.S. segments of the trip. The Seventh Circuit Court of Appeals held that the Commission was without jurisdiction to determine the reasonableness of freight rates for transportation taking place in Canada and therefore had no power to order reparations with respect to the Canadian portion of the trip. In reversing the Court of Appeals

---

9. It should be noted that we are not dealing here with any constitutional issue such as the power of Congress to attempt regulation of foreign commerce affecting domestic commerce within the United States. For Congress has not attempted to confer jurisdiction on the Commission as to all matters "affecting" commerce, but has expressly limited its jurisdictional grant. See United States v. Pennsylvania Railroad Co., 323 U. S. 612, 621, 65 S.Ct. 471, 89 L.Ed. 499 (1945).

The limiting language emphasized in the text was added to the original Interstate Commerce Act (Feb. 4, 1887, c. 104, § 1, 24 Stat. 379) by the Transportation Act of 1920 (February 20, 1920, c. 91, § 400, 41 Stat. 474). See generally H.Rep.No.456, 66th Cong. 1st Sess. (No. 10,1919).

10. Joint Brief of the United States and the Interstate Commerce Commission, at 10.

and affirming the Commission's exercise of jurisdiction, the Supreme Court said:

> where a carrier performing transportation within the United States enters into a joint through international rate covering transportation in the United States and abroad, the Commission does have jurisdiction to determine the reasonableness of the joint through rate and to order the carrier performing the domestic service to pay reparations in the amount by which that rate is unreasonable. 385 U.S. at 183–184, 87 S.Ct. at 360.

■ Thus the Supreme Court has held that the Commission does have jurisdiction to determine the reasonableness of an entire joint through international rate. We believe, however, that this is a far more limited holding than the Commission contends here. The Supreme Court did not say that the Commission has plenary powers over joint through international rates.[11] For in the same sentence the Court found the Commission's remedial powers limited to requiring the *domestic* carrier to pay reparations. It is significant that the Commission in *Canada Packers* had not sought reparations from or taken any direct action against the Canadian carrier. Nor has the Commission cited to the Court one instance where it had ever taken any *direct action against a foreign*

carrier for actions in a foreign country, regardless of whether or not such actions affected U.S. commerce or involved joint through international rates.[12] It is in this significant respect that the present case differs from *Canada Packers,* for here direct action against a foreign carrier is the logical next step to the Commission's assertion of jurisdiction.

In *H. K. Porter,* the Commission had found unreasonable a joint through international rate, and had ordered the participating Canadian and U.S. railroads "according as they participate in the transportation within the United States," to take "action . . . to cease their participation . . . ." 366 U.S. at 274, 81 S.Ct. 1341, 1343. A Three-Judge District Court had set aside the Commission's Order on the ground that the Commission was attempting to regulate rail transport in Canada beyond the Commission's jurisdiction. The Supreme Court agreed with the Commission. The Court emphasized that the remdeial provisions of the Commission's Order ran only against transportation within the United States. The Court noted that "the Commission's power to forbid unlawful rate discrimination is in no way diminished because the rates are published as joint through rates or *combinations through rates.*"

---

11. Indeed, it is well established that the Commission does not have the power to prescribe joint international rates, as it does domestic rates.

12. This is not to say that the Commission is without any power at all to reach a situation which apparently discriminates against U.S. carriers and shippers. For the Commission may proceed here just as it did in *Canada Packers,* by placing responsibility for any inequities found in joint rates upon the domestic carriers participating in those rates. Such domestic carriers would therefore either bear that financial burden or withdraw from the joint rates. Their withdrawal would no doubt be somewhat disruptive, but it would equally be disruptive to foreign carriers and would thus lay the consequences of inequitable rates squarely on the doorstep of the foreign carriers respon-

sible for introducing the inequities. This is admittedly an approach of indirection. Yet such indirection is a consequence of international boundaries and statutory limitations on the territorial extent of the Commission's powers. The carriers involved in international traffic thus bear the burden of adjusting the international through rates, just as they have long borne the burden of establishing such rates in the first place. The Commission has no appropriate direct role in the adjustments, just as it has long since recognized that it has no appropriate role in initially establishing the rates. The Commission's role is limited to reviewing the rates actually charged and requiring reparations of the domestic carriers when rates are found to be unreasonable. This role is fully adequate to protect the interests of American carriers, shippers, and the American public.

366 U.S. at 275, 81 S.Ct. at 1343. Yet, as in *Canada Packers*, the Court implied that the Commission's remedial powers cannot extend to direct control of the Canadian part of the transportation.[13] The conclusion follows that just as the jurisdiction of the Commission is in no way diminished because international rates are involved, neither is that jurisdiction thereby extended beyond "transportation (which) takes place within the United States." [14]

This reading of the limitations upon the Commission's jurisdiction is well supported by decisions of both the Commission and the Courts. In prescribing new rules in 1970 for joint through international rates, the Commission noted that "Canadian or Mexican carriers file with us, if they so desire, the tariffs establishing joint rates with our domestic carriers, and we do not thereby obtain jurisdiction over those foreign carriers." [15] The Commission has repeatedly held that it has "no jurisdiction to prescribe international rates for application partly within Canada . . . ." Thermoid Co. v. B. & O. Railroad Co., 303 I.C.C. 743, 752

(1958)[16] and that its powers over such rates are limited, as in *Canada Packers*, to holding domestic carriers responsible for reparations for past unreasonable international rates.[17]

■ Upon these considerations we find that the Commission has no jurisdiction to take remedial or punitive action directly against the plaintiff Canadian railroads for introduction of the proposed tariff schedules. If in subsequent proceedings the Commission should find that the new schedules result in an unreasonable joint through international rate, it remains free to take corrective action such as assessing reparations from domestic U.S. carriers participating in such rates. Since we find the Commission without jurisdiction over this case, the Orders striking the proposed tariff schedules from I.C.C. files appears to be of no consequence. It is unnecessary, therefore, for the Court to set aside said Orders or otherwise enjoin the Commission. It appears to the Court that Declaratory relief alone will suffice to resolve this matter.

Judgment for plaintiffs shall be entered accordingly.

13. "The District Court's holding that the Commission was without jurisdiction was based on its assumption that the Commission's order attempted to control the Canadian part of the transportation." 366 U.S. at 274, 81 S.Ct. at 1343.

14. 49 U.S.C. § 1(1).

15. International Joint Rates and Through Rates, 337 I.C.C. 625, 635 n. 11 (1970). Cf. Incentive Per Diem Charges—1968, 337 I.C.C. 217 (1970) at 237–38.

16. Cf. Class Rate Investigation, 1939, 262 I.C.C. 447, 515 (1945), Celon Co. v. Canadian Pacific Ry. Co., 238 I.C.C. 407, 410 (1940), Bicket Rubber Prod. Corp. v. Chicago, M.

St. P. & P. R. Co., 163 I.C.C. 78 (1930) ; *Accord* Lewis-Simas Jones Co. v. Southern Pacific Co., 283 U.S. 654, 660, 51 S.Ct. 592, 75 L.Ed. 1333 (1931).

17. Thermoid Co. v. B. & O. Railroad Co., 303 I.C.C. 743 (1958), Black Horse Tobacco Co. v. Illinois Central R. Co., 17 I.C.C. 588 (1910), Citizens Gas & Coke Utility v. Canadian National Rys., 325 I.C.C. 527 (1965). *Accord* News Syndicate Co. v. New York Central R. Co., 275 U.S. 179, 48 S.Ct. 39, 72 L.Ed. 225 (1927), Lewis-Simas Jones Co. v. Southern Pacific Co., 283 U.S. 654, 51 S.Ct. 592, 72 L.Ed. 1333 (1931), Great Northern Railway Co. v. Sullivan, 294 U.S. 458, 55 S.Ct. 472, 79 L.Ed. 992 (1935).