# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 13, 2013      Decided October 25, 2013

No. 11-1480

JAMES RIFFIN,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD
AND UNITED STATES OF AMERICA,
RESPONDENTS

On Petition for Review of an Order
of the Surface Transportation Board

*James Riffin*, *pro se*, argued the cause and filed the briefs for petitioner.

*Jeffrey D. Komarow*, Attorney, Surface Transportation Board, argued the cause for respondents. With him on the brief were *Robert B. Nicholson* and *Finnuala K. Tessier*, Attorneys, U.S. Department of Justice, *Raymond A. Atkins*, General Counsel, Surface Transportation Board, and *Craig M. Keats*, Deputy General Counsel. *Theodore L. Hunt*, Attorney, Surface Transportation Board, entered an appearance.

Before: ROGERS, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: James Riffin petitions for review of a decision by the Surface Transportation Board ("the Board") rejecting his application for a certificate authorizing the acquisition and operation of a small length of industrial railroad track because his application refused any obligation to transport "toxic inhalation hazard" products. For the following reasons, we deny the petition for review.

**I.**

On September 1, 2011, Riffin and Eric Strohmeyer filed a joint application with the Board pursuant to 49 U.S.C. § 10901 to acquire and operate approximately 800 feet of privately-owned railroad track located in New Jersey (hereinafter "Riffin Application"). Section 10901 provides that a person other than a rail carrier may "acquire a railroad line or acquire or operate an extended or additional railroad line, only if the Board issues a certificate authorizing such activity." 49 U.S.C. § 10901(a)(4) (2006). The Board "shall issue" an authorization certificate "unless the Board finds that such activities are inconsistent with the public convenience and necessity. Such certificate may approve the application as filed, or with modifications, and may require compliance with conditions . . . the Board finds necessary in the public interest." *Id.* § 10901(c).

In the application, Riffin and Strohmeyer proposed to interchange with the Consolidated Rail Corporation ("Conrail") at the western end of the track and provide rail service to adjacent properties and transfer cargo to local shippers. They "explicitly propose[d] to limit the goods to be shipped to non-Toxic Inhalation Hazard ["TIH"] products." Riffin Application Part 3. They stated that "[t]his limitation on their obligation to carry is warranted, since a common carrier is only required to carry that which it is capable of carrying." *Id.* Part

5. They also stated that to carry TIH would result in insurance premiums that would be too expensive and that their lessor had requested they not carry TIH out of concern for its own potential liability. Further, Riffin and Strohmeyer sought "a temporary waiver of their obligation [under 49 C.F.R. Part 1150] to provide financial information, traffic projections, lease agreement, details about potential shippers, and their interchange agreement with Conrail," stating they expected to provide most of this information in two weeks. *Id.* Part 11.

The Board solicited comments on the Riffin Application. In comments filed on September 8, 2011, Conrail stated that, notwithstanding the request for a temporary waiver of 49 C.F.R. § 1150.10(a), until Riffin and Strohmeyer submitted all of the information required under the Board's regulations, the application was defective as a matter of law. On this basis, Conrail requested that the Board either reject the application without prejudice or hold it in abeyance until all the information was provided.

On October 18, 2011, the Board rejected the Riffin Application. Although agreeing with Conrail that Riffin and Strohmeyer had not submitted a significant amount of required information, the Board stated that "their application must be rejected because it contains an even more basic defect: Strohmeyer and Riffin expressly condition their request . . . on receiving a common carrier obligation that would be limited by excluding any obligation to transport a shipment designated as a toxic inhalation hazard (TIH)." *Eric Strohmeyer*, STB Docket No. 35527, 2011 WL 5006471, at *1 (Oct. 18, 2011) (hereinafter "Decision"). The Board observed it had explained in two recent decisions that "railroads have not only a right but a statutory common carrier obligation to transport hazardous materials where the appropriate agencies have promulgated comprehensive safety regulations." *Id.* (internal quotation

marks and alterations omitted).  The Board noted that a number of federal agencies, including the Department of Transportation, Federal Railroad Administration, Transportation Security Administration, and Nuclear Regulatory Commission, had promulgated "extensive regulations governing the transportation of hazardous materials by rail." *Id*.  The Board further observed that because freight rail carriers have a statutory obligation to transport hazardous materials "applications that seek to limit the requested certificate of public convenience and necessity in such a way as to exclude the transportation of TIH from the applicant's common carrier responsibilities are inherently defective, and therefore incomplete." *Id*.

Strohmeyer, but not Riffin, filed a petition to reopen the Decision on the asserted ground that an applicant seeking to become a common carrier need not agree to carry hazardous materials because common carriers had a common-law right to designate the goods they were willing to carry for hire.  On May 10, 2012, the Board denied the petition, rejecting Strohmeyer's attempt to distinguish an applicant seeking to become a common carrier from existing carriers, as the Board saw no basis for distinguishing new and existing carriers' respective obligations.  The Board faulted the petition for "fail[ing] to confront the reality that allowing new applicants to limit their common carrier obligation in whatever ways they choose would produce gaps in the existing rail system with regard to specific traffic, thereby undermining Congress' clear intent to establish an integrated national network." *Eric Strohmeyer*, STB Docket No. 35527, 2012 WL 1686170, at *2, 2012 STB LEXIS 187, at *7 (May 10, 2012) (hereinafter "Reopening Decision").  The Board noted that Strohmeyer's assertion that carriers historically had the right at common law to decide what goods they would carry was not relevant to a railroad's statutory obligations under 49 U.S.C. § 11101.  *See id.* at *2 n.4.

## II.

Riffin petitions for review of the Decision on the ground that under the common law common carriers could designate which commodities they intended to transport and those which they did not. The Board rejects this position on several grounds but as a threshold matter contends that Riffin has forfeited this argument by failing to raise it before the Board. We conclude no forfeiture occurred here. On the merits, however, Riffin's argument is unpersuasive.

### A.

As a "general rule," the Supreme Court has "recognized in more than a few decisions, and Congress has recognized in more than a few statutes, that orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts." *United States v. L. A. Tucker Truck Lines*, 344 U.S. 33, 36–37 (1952) (internal footnotes omitted). Accordingly, reviewing courts generally will not consider an argument that was not raised before the agency "at the time appropriate under its practice." *Id.* at 37. This court has previously declined to consider arguments that were not timely raised before the Board. *See BNSF Ry. Co. v. STB*, 604 F.3d 602, 610–11 (D.C. Cir. 2010); *BNSF Ry. Co. v. STB*, 453 F.3d 473, 479 (D.C. Cir. 2006).

The Board's forfeiture claim rests on its position that Riffin failed to raise his common-law arguments in the Riffin Application itself, maintaining he had both an opportunity and obligation to demonstrate that he could refuse to carry TIH products. Riffin was, the Board claims, "on notice that his proposed refusal to transport TIH products was contrary to Board policy" in light of his frequent appearances before the

Board and the prior Board and court decisions discussing railroads' statutory obligation to transport hazardous materials. Respt's Br. 13–14.

This court has held that a petitioner need not seek administrative reconsideration from the Board in order to raise an argument for which it lacked notice until the Board issued its final decision. *CSX Transp., Inc. v. STB*, 584 F.3d 1076, 1079 (D.C. Cir. 2009). This is what happened here. The only other party in the Board proceedings, Conrail, had objected to the Riffin Application on the ground that it was incomplete, not that it conflicted with Board policy regarding transportation of hazardous materials. Rather, the Board *sua sponte* raised the hazardous materials issue in its Decision without first providing Riffin an opportunity to address the issue. Neither 49 U.S.C. § 10901 nor the Board's regulations require an applicant for a § 10901 certification to include a memorandum of law in the application. *Cf.* 49 C.F.R. § 1150.8 (2012). Even if Riffin frequently appeared in proceedings, it is not entirely implausible that the Board might view new entrants in Riffin's situation somewhat differently for purposes of carrying hazardous material; its precedent did not specifically address the question. Under the circumstances, Riffin had no reason to think he had to make his common-law arguments part of his application to the Board.

## B.

Riffin contends that there is no statutory common carrier obligation to transport hazardous materials because Congress did not enact legislation requiring common carriers to transport all goods and, consequently, the common law remains in effect. Under common law, he claims, carriers could designate which commodities they intended to transport. Riffin observes that the Board's predecessor, the Interstate Commerce Commission ("the ICC"), historically ruled that it lacked jurisdiction to

compel carriage pursuant to § 1(4) of the Interstate Commerce Act, now 49 U.S.C. § 11101(a) (2006).

Section 11101(a) provides that "[a] rail carrier providing transportation or service subject to the jurisdiction of the Board under this part [49 U.S.C. §§ 10101–11908] shall provide the transportation or service on reasonable request." Riffin does not contest that the rail service he sought to provide is subject to "this part." The Board has exclusive regulatory authority over transportation conducted over the interstate rail network. *See id.* § 10501(a). The question is whether § 11101(a), in conjunction with the Board's licensing authority under § 10901, authorizes the Board to compel new carriers to transport TIH materials. The court reviews the Board's interpretation of the statute it administers under the familiar framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). We hold that the Board's interpretation of the freight carriage obligations required under § 11101(a) is a permissible interpretation of the statute. *See Chevron*, 467 U.S. at 842–43.

As the Supreme Court recently confirmed in *City of Arlington, TX v. FCC*, — U.S. —, 133 S.Ct. 1863, 1868 (2013), an agency's interpretation of a statutory ambiguity that concerns the scope of its regulatory authority is entitled to deference under *Chevron*. Because "every new application of a broad statutory term can be re-framed as a[n] . . . extension of the agency's jurisdiction," "the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not." *Id.* at 1871. In *United States v. Pennsylvania Railroad Co.*, 323 U.S. 612, 615–19 (1945), the Supreme Court upheld the ICC's authority to compel railroads to interchange their rail cars with water carriers despite the statute's silence on the subject. Rejecting the view "that the absence of specific language indicates a purpose of Congress not to require" the activities the ICC had ordered, *id.* at 616, the Court concluded

that the Interstate Commerce Act "provide[s] sufficient authorization for the Commission's order." *Id.* at 619. The Court explained:

> The very complexities of [rail transportation] have necessarily caused Congress to cast its regulatory provisions in general terms. Congress has, in general, left the contents of these terms to be spelled out in particular cases by administrative and judicial action, and in the light of the congressional purpose to foster an efficient and fair national transportation system.

*Id.* at 616.

Similarly, the Supreme Court recognized that the ICC retained its regulatory authority even when it had previously declined to exercise jurisdiction over the issue in question. In *American Trucking Ass'ns v. Atchison, Topeka & Santa Fe Railway Co.*, 387 U.S. 397 (1967), the Court held that the ICC had authority to compel rail carriage even though its new rules would have departed from its established policies. Acknowledging that for over 25 years the ICC had expressly not required the service it now sought to compel, the Court observed that "the Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice." *Id.* at 416. Regulatory agencies "are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday." *Id.*

Riffin declines to engage with the effect of this precedent on his position. Instead, he cites decisions that do not discuss the statutory common carrier obligation under § 11101(a) and, the Board notes, either were decided before enactment of the National Transportation Act of 1920 giving the ICC licensing

authority or, if post-1920 cases, do not deal with the Board's authority to require common carrier railroads to handle certain commodities as part of their common carrier obligation. In *American Trucking*, 387 U.S. at 406, the Supreme Court stated that it is an "obvious fact that the Interstate Commerce Act codified the common-law obligations of railroads as common carriers," and that it does so "in the most general terms." *See also Dir. Gen. of R.R.s v. Viscose Co.*, 254 U.S. 498, 504 (1921). Tracing the history of railroad regulation and § 1(4) of the Act, the Court noted that under that section (the predecessor to 49 U.S.C. § 11101(a)) the "obligation as common carriers is comprehensive and exceptions are not to be implied." *Am. Trucking Ass'ns*, 387 U.S. at 407.

This court engaged in a similar historical analysis in *Cellco Partnership v. FCC*, 700 F.3d 534, 545–47 (D.C. Cir. 2012), observing that, "[o]ver the decades, these common law duties [of common carriers] were codified in a variety of statutory regimes," including the Interstate Commerce Act, and that given "the evolving meaning of common carriage . . . in the midst of changing technology and the evolving regulatory landscape," the relevant administrative agencies have "significant latitude to determine the bounds of common carriage in particular cases." Addressing a similar common carriage provision for airlines, the court explained in *Delta Air Lines, Inc. v. CAB*, 543 F.2d 247, 259 (D.C. Cir. 1976), that "[t]he extent to which the airline carriers of today have a right to delineate what they will carry and for whom depends not only upon their common law responsibilities as common carriers, but also upon the statutory obligations and regulatory powers created by the Federal Aviation Act."

More directly, the Sixth Circuit concluded in *Akron, Canton & Youngstown Railroad Co. v. ICC*, 611 F.2d 1162, 1166 (6th Cir. 1979), that although the Interstate Commerce Act "codified

the common-law obligations of railroads as common carriers, this does not mean that the Act created no purely statutory obligations of rail carriers" (internal citation omitted).  While recognizing that "at common law carriers could pick and choose the goods which they would transport in common carriage," the court observed that "even at common law, railroad companies, 'whose property and facilities are affected with a public interest, [were] ordinarily held to be common carriers of goods delivered to them for transportation.'"  *Id*. (quoting 12 C.J.S. Carriers § 6).  The court further observed that the ICC "has primary jurisdiction to execute the National Transportation Policy's mandate . . . [under] 49 U.S.C. § 10101," and that "[i]f the Congressional delegation to the Commission of power to implement the National Transportation Policy is to be effective, the Commission must have the statutory authority exercised by its order . . . [stating its] preference of rail over truck carriage of spent fuel." *Id.* at 1168.

Riffin's efforts to demonstrate that § 11101 must be read to support the view that a new common carrier may decline to provide transportation of certain commodities are to no avail.  He urges that § 11101 by its plain text speaks only to a carrier already "*providing* [certain] transportation or service" that must provide "*the* transportation or service" upon reasonable request.  49 U.S.C. § 11101(a) (emphasis added).  So, he suggests, if a new carrier opts not to provide transportation for a particular commodity, then it need not do so in the future, even on reasonable request.  Riffin compares different text in the predecessor provision (former 49 U.S.C. § 1(4)) and points to general policy statements made by Congress elsewhere in the ICC Termination Act of 1995, 49 U.S.C. § 10101(1)–(8).

In rejecting the Riffin Application, the Board relied principally on two decisions where it had stated that freight "[r]ailroads have not only a right but a statutory common carrier

obligation to transport hazardous materials 'where the appropriate agencies have promulgated comprehensive safety regulations.'" Decision at \*1 (citing *BNSF Ry.*, FD 35164, slip op. at 6 (STB served Dec. 2, 2010) (quoting *Union Pac. R.R.*, FD 35219, slip op. at 3–4 (STB served June 11, 2009))). In *Union Pacific*, the Board issued a declaratory order upon determining that a railroad had a statutory common carrier obligation to transport chlorine, a TIH, through urban areas despite alternative sources of chlorine closer to the requested destinations. *See Union Pac. R.R.*, FD 35219, slip op. at 1. Stating that railroads have a statutory common carrier obligation under 49 U.S.C. § 11101(a) to provide transportation or service "upon reasonable request," *id.* at 3, the Board observed that "[w]hat constitutes a reasonable request for service is not statutorily defined but depends on all the relevant facts and circumstances." *Id*. at 3–4. It also observed that "Court and Board precedent have addressed the extent of the common carrier obligation with regard to transporting hazardous materials" and that "the common carrier obligation requires a railroad to transport hazardous materials where the appropriate agencies have promulgated comprehensive safety regulations." *Id.* at 4. At that time the Department of Transportation and Transportation Security Administration had comprehensive regulatory programs addressing the safety and security risks of transporting hazardous materials by rail. The Board concluded that allowing a railroad to avoid its obligation to transport hazardous materials nonetheless would require it improperly to substitute its judgment about safety for that of the regulatory agencies. *Id.* at 5–6. In *BNSF*, FD 35164, slip op. at 6, the Board applied that view of common carrier obligations, ruling that BNSF's transportation of hazardous materials did not pose an impermissible safety threat to area residents because the petitioner offered no evidence that BNSF had violated any applicable safety regulations.

The rule established by *BNSF* and *Union Pacific* represents at least a permissible interpretation of the statutory requirement that a "rail carrier providing transportation or service subject to the jurisdiction of the Board . . . shall provide the transportation or service on reasonable request." 49 U.S.C. § 11101. Where an agency has promulgated comprehensive safety regulations for a particular type of cargo (helping to ensure the safety of shipments of that category of freight), those regulations can be viewed as transforming a shipping request into a presumptively reasonable one under § 11101. Although the Board had no occasion to address a distinction between new and existing carriers in *BNSF* and *Union Pacific*, the rule from those cases embraces new and existing carriers. In denying Strohmeyer's petition to reopen the Decision, the Board explained that a distinction between new and existing carriers who transport TIH products would prove unworkable because it could produce gaps in the national rail network. Reopening Decision at *2.

Riffin's response, that approving his application would not create any such "gap" because he sought to operate only a small length of track at the tail end of an existing rail, misses the point. The "gaps" of concern to the Board are those that would arise from permitting new carriers to define the scope of their own common carrier obligations, not the 800-foot "gap" that would result from Riffin's opt-out in particular. The Riffin Application sought a blanket exemption that would shield Riffin and Strohmeyer from the obligation to entertain requests to carry TIH. Much as the Sixth Circuit observed in *Akron*, 611 F.2d at 1168, the Board's stated interest, given the complexity and interdependence of the national rail system, in ensuring the freight rail network remains open to transportation of hazardous materials without any gaps implements a public interest in consistency and provides a reasonable basis for treating new and existing carriers alike. Riffin's argument, that "[i]mposing more limited obligations on new carriers promotes an efficient rail

transportation system and promotes the continuation of a sound rail transportation system and facilitates entry into the industry," Reply Br. 25 (internal quotation marks, ellipses, and citations omitted), was not presented in his opening brief, which means it "ordinarily comes too late for our consideration," *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835 (D.C. Cir. 2001); in any event, it is the Board, not this court, that makes such policy judgments.

The Board's reasoning for rejecting the distinction between existing and new common carrier obligations was neither arbitrary nor capricious nor contrary to law. *See Vill. of Barrington, Ill. v. STB*, 636 F.3d 650, 670 (D.C. Cir. 2011). Likewise the Board's response to Riffin's statement about cost-prohibitive insurance premiums. The Board explained that "[a]pplicants for common carrier authority . . . cannot lawfully make fulfilling their statutory obligations contingent upon whether they think it is 'worth it' to do so"; "a carrier must adhere to its statutory obligations even if it suffers hardship in so doing." Decision at *2 (quoting *Pejepscot Indus. Park, Inc.*, 6 S.T.B. 886, 898 (2003) (citing *Decatur Cnty. Comm'rs v. STB*, 308 F.3d 710, 715 (7th Cir. 2002)), *reconsideration granted in part*, 7 S.T.B. 220 (2003)) (internal quotation marks omitted). Rather, "[t]he only appropriate mechanisms a railroad may employ to excuse itself, either permanently or temporarily, from its common carrier obligations on a line of railroad are abandonment, discontinuance, or embargo." *Id.* In *Pejepscot*, the Board instructed that if a line of rail track has not been abandoned or embargoed, there is "an absolute duty to provide rates and service over the [l]ine upon reasonable request," and a "failure to perform that duty [is] a violation of section 11101." 6 S.T.B. at 899. The Board's position reflects the public interest in ensuring the network remains open for transport of hazardous materials where comprehensive security and safety regulations are present.

Accordingly, because the Board has permissibly determined the scope of a freight railroad's common carrier obligation under 49 U.S.C. § 11101(a), and the Board's rejection of Riffin's application was reasonable, we deny the petition for review.