PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-3218
_____

UNITED REFINING COMPANY,
Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY
_____

On Petition for Review of a Decision of the
Environmental Protection Agency
_____

Argued December 14, 2022

Before: RESTREPO, McKEE, and SMITH,
*Circuit Judges*

(Filed  April 5, 2023)

Mark W. DeLaquil [Argued]
Baker & Hostetler
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
    *Counsel for Petitioner*


Patrick R. Jacobi [Argued]
United States Department of Justice
Environmental Defense Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
    *Counsel for Respondent*

_____

OPINION OF THE COURT
_____

SMITH, *Circuit Judge*.

Petitioner United Refining Co. ("United") challenges the Environmental Protection Agency's ("EPA") denial of United's request for a hardship exemption from EPA's Renewable Fuel Standard program. United chiefly argues that EPA arbitrarily relied on what United characterizes as an "accounting trick" that artificially inflated United's running average net refining margin and thus led EPA to deny United's

2

exemption request. We are not persuaded that this discretionary agency decision—or any other aspect of EPA's decision-making process that United now challenges on review—provides a basis for setting aside EPA's denial of United's exemption request. We will, therefore, deny United's petition for review.

## I.     Background

### A. Statutory and Regulatory Framework

The Renewable Fuel Standard ("RFS") program requires gasoline and diesel fuel refiners, blenders, and importers ("obligated parties") to ensure that a certain portion of their annual transportation fuel production consists of renewable fuels. Congress authorized the creation of the RFS program in 2005 with the long term goal of shifting the United States toward greater reliance on sustainable domestically-produced energy. *See* Energy Policy Act of 2005, Pub. L. No. 109–58, § 1501, 119 Stat 594, 1067–76 (2005) (codified at 42 U.S.C. § 7545(o)). The statute set out annual target volumes of renewable fuel production for each year through 2022. 42 U.S.C. § 7545(o)(2)(B)(i). For the purpose of the statute, the category of renewable fuels includes biodiesel, biogas, ethanol, and certain other fuels produced from biomass. *Id.* § 7545(o)(1)(B)–(F). Congress tasked EPA with enacting regulations to bring about a gradual increase in the volume of renewable transportation fuel sold in the continental United States. *Id.* § 7545(o)(2)(A)(i).

3

*1. How the RFS program works*

Under the RFS program, EPA annually sets standards dictating, in percentage terms, what component of each obligated party's transportation fuel production must consist of renewable fuels. *Id.* § 7545(o)(3). For example, EPA's 2019 standards required renewable fuels to comprise 10.97 percent of each obligated party's transportation fuel output. *See* Renewable Fuel Standard Program: Standards for 2019 and Biomass-Based Diesel Volume for 2020, 83 Fed. Reg. 63,740–41 (Dec. 11, 2018). All obligated parties must meet the same percentage threshold.

EPA has created a credit-trading system to track compliance with the RFS program using Renewable Identification Numbers ("RINs"). *See* 40 C.F.R. § 80.1401; 42 U.S.C. § 7545(o)(5)(A) (authorizing creation of credit trading program). A RIN is a unique serial number assigned to each gallon of renewable fuel that is produced in or imported to the United States. 40 C.F.R. § 80.1426. Each RIN remains associated with a discrete gallon of renewable fuel until the fuel's owner "separates" the RIN from the fuel. *Id.* § 80.1429. Once a RIN is separated from the fuel, it becomes a fungible credit that an obligated party may redeem with EPA (or, in the agency's parlance, "retire") or transfer to another private party. *Id.* §§ 80.1427, 80.1429(c)–(e); 42 U.S.C. § 7545(o)(5)(A).

An obligated party demonstrates compliance with the RFS program by annually redeeming a quantity of RINs equal to its renewable fuel obligations under the RFS program. 40 C.F.R. § 80.1427, 80.1451. An obligated party may generate enough RINs to satisfy its RFS obligations simply by

4

producing renewable fuels or by purchasing and blending renewable fuels into conventional transportation fuel. An obligated party also may purchase additional RINs on the market. If an obligated party produces or purchases more RINs than it needs, it may sell the excess RINs to other private parties. But RINs are time-limited, and "may only be used to demonstrate [RFS] compliance . . . for the calendar year in which they were generated or the following calendar year." *Id.* § 80.1427(a)(6)(i).

## 2. *Exemptions for small refineries*

Recognizing that refineries with limited production capacity lack economies of scale and so would face additional hurdles in complying with the RFS program, Congress authorized EPA to waive the requirements of the RFS program for small refineries. 42 U.S.C. § 7545(o)(9). The statute defines "small refinery" to mean any refinery with a maximum production capacity of 75,000 or fewer barrels per day. *Id.* § 7545(o)(1)(K). Congress initially exempted all small refineries from their RFS compliance obligations until 2011. *Id.* § 7545(o)(9)(A)(i). Congress tasked the Department of Energy ("DOE") with studying "whether compliance with [the RFS program] would impose a disproportionate economic hardship on small refineries." *Id.* § 7545(o)(9)(A)(ii)(I). Congress instructed EPA to consider the results of DOE's study and, if the agency identified potential disproportionate hardships on small refineries, to extend the small refinery exemption beyond 2011. *Id.* § 7545(o)(9)(A)(ii)(II). In the alternative, Congress authorized EPA to grant temporary discretionary exemptions to any small refineries for whom compliance with the RFS

5

program would present a "disproportionate economic hardship." *Id.* § 7545(o)(9)(B)(i). During the period at issue here, EPA had allowed the blanket exemption for all small refineries to lapse and considered each individual refinery's hardship exemption petition on a case-by-case basis.

The practical effect of a hardship exemption is that the exempt refinery need not comply with EPA's renewable fuel standards for the year of exemption and so need not redeem any RINs for that year. If a refinery has produced or purchased RINs while its exemption petition is pending before the agency, the exemption enables it to sell those unneeded RINs to other parties. On the flip side, if a refinery has not produced or purchased any RINs or has produced or purchased too few RINs to meet its compliance obligations, the exemption spares it the expense of purchasing RINs. In either event, a hardship exemption represents a significant benefit to the refinery.

### 3. *How EPA evaluates small refinery exemption petitions*

To receive a hardship exemption, a small refinery must submit to EPA a petition demonstrating "disproportionate economic hardship." 40 C.F.R. § 80.1441(e)(2). The petition "must specify the factors that demonstrate a disproportionate economic hardship and must provide a detailed discussion regarding the hardship the refinery would face" if it were forced to comply with the RFS program. *Id.* § 80.1441(e)(2)(i). EPA regulations thus require the refinery to provide all relevant data to the agency. But the regulations do not require the refinery to support its petition with legal arguments, nor do

6

they prescribe any additional actions that the refinery may take after submitting the exemption petition.

EPA evaluates hardship petitions "in consultation with the Secretary of Energy" and considers DOE's research on the economic hardships faced by small refineries as well as "other economic factors." 42 U.S.C. § 7545(o)(9)(B). EPA refers each exemption petition to DOE, which in turn scores the petition on a matrix (the "DOE Matrix"). The DOE Matrix aims to capture DOE's aforementioned findings on the RFS program's economic effects on small refineries. The DOE Matrix scores a refinery along several different metrics, such as the refinery's production capacity, its financial condition, its access to capital and other lines of business, the effect of state regulations on its operations, and the effect of the RFS program on the refinery's operations and competitiveness. DOE scores each metric between 0 and 10 and then aggregates the scores to yield two overarching indices: one index designed to capture the disproportionate structural impact of regulation on the refinery and one index designed to capture the refinery's business viability. DOE recommends that EPA grant a full exemption to refineries earning a score greater than 1 on both indices, a 50 percent exemption to refineries earning a score greater than 1 on one index, or no exemption to refineries that earn a score less than 1 on both indices. After reviewing DOE's recommendation, EPA decides whether to grant the exemption petition and then notifies the refinery of its decision. Unlike DOE, EPA has construed § 7545 to authorize only a full exemption or no exemption and thus does not grant 50 percent exemptions even when DOE recommends that it do so. For example, in the 2018 compliance year, EPA granted full

7

exemptions to all refineries for which DOE recommended a 50 percent exemption.

Of particular relevance to this case, one metric that DOE considers when evaluating hardship petitions is the refinery's "relative refining margin." This metric compares the refinery's average net profit per barrel for the previous three compliance years against the industry average net profit per barrel over the same period. A refinery whose net profit per barrel was above the industry average receives a score of 0; a refinery whose net profit per barrel was positive but below the industry average receives a score of 5; and a refinery whose net profit per barrel was negative receives a score of 10.

## B. United's Petition

United operates a small refinery in Pennsylvania and produces fuel that it sells in Pennsylvania, New York, and Ohio. United has periodically sought and received hardship exemptions since the creation of the RFS program, most recently in the 2017 and 2018 compliance years. United acquired 2017 and 2018 RINs before EPA granted its exemption petitions for those years. EPA delayed granting the 2017 and 2018 exemption petitions, and United retained its RINs while its petitions were under review. EPA eventually granted United's 2017 and 2018 exemption petitions in early 2019. United then sold its 2017 and 2018 RINs.

In 2019, as in previous years, United sought an exemption from the requirements of the RFS program. But rather than accepting the data in United's petition at face value—as it apparently had done in previous years—EPA

8

responded by asking United to "let [EPA] know how United [had] accounted for the financial benefit of its 2018 RFS exemption." J.A. 249. Specifically, EPA asked United to explain whether it sold "any 2017 or 2018 RINs that were [subject to] the [2018] exemption, and if so, where in the margin spreadsheet were the sale proceeds included." J.A. 249.

In response, United submitted an amended financial statement which explained that revenue from RINs generated in a particular year was included in net revenues for that year, even if the RINs in fact were sold in a later calendar year. The revised financial statement listed United's proceeds from the sale of 2017 and 2018 RINs as separate line items in the financial statements for 2017 and 2018, respectively. United's updated accounting resulted in higher net refining margins for 2017 and 2018 as compared to United's originally submitted financial statement, but a lower net refining margin for 2019.

Notably, the DOE Matrix considers a refinery's average refining margin for the three years *before* the year of the petition, which in this case meant looking to United's (high) margins from 2016 through 2018 and disregarding its (low) 2019 margin. As a result, United's amended figures showed a three-year refining margin that was higher than the margin in United's original submission and, crucially, higher than the industry average for that period.

EPA referred United's amended submission to DOE, which evaluated United's submission under the DOE Matrix. Three of DOE's scoring determinations are relevant to this appeal. First, DOE found that United's amended financial statements placed its three-year refining margin above the

9

industry average and therefore warranted a score of 0 for that metric. Second, DOE assigned United scores of 0 for the access to capital and other lines of business metrics because United is a direct subsidiary of Red Apple Group, a large private corporation with diversified business activities. Finally, DOE assigned United a score of 0 for the state regulations metric because United is located in Pennsylvania, a state that does not impose exceptionally restrictive regulations on refineries. Based on these scores and United's scores on the rest of the DOE Matrix, DOE at first recommended that United not receive a hardship exemption.

DOE subsequently changed its recommendation to account for the effects of COVID-19. Recognizing that the pandemic caused widespread disruption to global energy markets, DOE updated its recommendation and suggested that United receive a 50 percent exemption for the 2019 compliance year.

EPA was less forgiving—it denied United any exemption. Though EPA noted that DOE's updated recommendation accounted for the effects of COVID-19, EPA declined to consider events "that did not emerge until 2020, the year *after* the petition in question." J.A. 11 n.3 (emphasis in original). EPA accepted the rest of DOE's recommendation and determined that United was not entitled to a hardship exemption for the 2019 compliance year.

## II.  Jurisdiction

United timely filed its petition for review. We have jurisdiction to review EPA's order pursuant to 42 U.S.C. §

10

7607(b)(1). Venue is proper because EPA's order pertained to United's refinery in Pennsylvania. *See* 42 U.S.C. § 7607(b)(1).

## III.   Discussion

We review EPA's action applying the Administrative Procedure Act ("APA"), under which we will set aside EPA's order if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, we ask whether the agency has "failed to consider an important aspect of the problem," whether the agency's decision is "unreasoned," or whether the agency has "relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). We also ask whether the agency's decision is supported by sufficient "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up). But we may not "substitute [our] judgment for that of the agency," and will uphold the agency's decision so long as it was reasonable. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Here, none of United's challenges to the denial of its 2019 exemption petition is persuasive under the APA's narrow standard of review.

> **A. EPA reasonably attributed RIN sale revenue to the year of generation rather than the year of sale.**

The gravamen of United's petition for review is that EPA acted arbitrarily and capriciously by attributing United's

11

proceeds from selling 2017 and 2018 RINs to the years in which the RINs were generated even though United sold the RINs in 2019. On review before this Court, EPA argues that United forfeited this challenge by failing to object to EPA's accounting methodology during the proceeding before the agency. We reject EPA's forfeiture argument and so consider United's objection on the merits. But on the merits, United's challenge fails.

### 1. *United did not forfeit its objection to EPA's accounting method.*

To start, United did not forfeit its objection to EPA's decision to attribute RIN sale revenue to the year of generation because RFS exemption petitions do not require issue exhaustion. As a general matter, "federal appellate courts do not consider issues that have not been passed on by the agency," as it would be unfair to force the agency to litigate issues that it did not have the opportunity to address in the first instance. *Sw. Pa. Growth All. v. Browner*, 121 F.3d 106, 112 (3d Cir. 1997) (cleaned up). But this is only a "general rule." *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37 (1952). Most "requirements of administrative issue exhaustion are . . . creatures of statute" or agency regulations. *Sims v. Apfel*, 530 U.S. 103, 107 (2000). And where, as here, there is no statutory or regulatory requirement that a litigant raise an issue in front of the agency before seeking judicial review of that issue, the decision of whether to impose an issue exhaustion requirement "is a matter of sound judicial discretion." *Cerro Metal Prods. v. Marshall*, 620 F.2d 964, 970 (3d Cir. 1980).

12

When deciding whether to impose an issue exhaustion requirement in the absence of a statutory directive, we look to "the nature of the claim presented," the "characteristics of the particular administrative procedure" at issue, and the competing individual and governmental interests at play. *Cirko ex rel. Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153 (3d Cir. 2020) (cleaned up). But we do not weigh these factors equally, and Supreme Court precedent teaches that the characteristics of the proceeding—that is, whether the proceeding is more like a common law adversarial proceeding or a civil law inquisitorial proceeding—predominate. *See Carr v. Saul*, 141 S. Ct. 1352, 1360 (2021) (treating the characteristics of the proceeding as dispositive). This stands to reason, as "[t]he basis for a judicially imposed issue-exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Sims*, 530 U.S. at 109. And "[t]he critical feature that distinguishes adversarial proceedings from inquisitorial ones is whether claimants bear the responsibility to develop issues for adjudicators' consideration." *Carr*, 141 S. Ct. at 1358.

Here, the character of the hardship exemption proceeding tilts decidedly against imposing an issue exhaustion requirement, as a refinery petitioning for RFS exemption bears no responsibility—indeed, has no opportunity—to develop legal issues in front of the agency. A refinery bears the initial burden of submitting a petition that "specif[ies] the factors that demonstrate a disproportionate economic hardship" under the DOE Matrix and discusses "the hardship the refinery would face in" complying with the RFS program. *See* 40 C.F.R. § 80.1441(e)(2)(i). But this

13

information is purely factual, and a refinery need not submit any legal arguments in support of its petition. After the refinery has submitted the petition, the ball is in EPA's court: EPA develops the administrative record, coordinates with DOE to assess the submission under the DOE Matrix, reviews DOE's recommendation, and decides whether to grant or deny the requested exemption. At no point in the proceeding does EPA ask for oral or written arguments on whether the refinery ought to be exempt from the RFS program. Indeed, United avers that it was unaware of EPA's choice of accounting methodology until EPA issued a final decision denying United's exemption petition.

In this respect, RFS exemption petitions are similar to the Social Security ALJ proceedings that the Supreme Court, like this Court, determined to be non-adversarial. Like a small refinery seeking exemption from the RFS program, a Social Security claimant bears the initial burden of submitting a form that articulates the basis for relief. *Carr*, 141 S. Ct. at 1359. And as with an RFS exemption petition, the rest of a Social Security appeal is "driven by the agency rather than the claimant" insofar as the agency adjudicator bears the burden of developing issues. *Cirko*, 948 F.3d at 156. To be sure, an RFS exemption request is longer and more factually complex than the "roughly three lines" available for a Social Security claimant to state his case. *Carr*, 141 S. Ct. at 1359. But length alone does not alter the fundamental balance between a petitioner who is responsible for providing initial data and an agency that is, thereafter, responsible for everything else. Thus, RFS exemption petitions, no less than Social Security appeals,

14

are inquisitorial in character and do not give rise to an issue exhaustion requirement.

To be sure, certain other factors counsel for requiring issue exhaustion in the RFS exemption petition context. Most notably, the nature of United's claim—an APA challenge to the reasonableness of the agency's action—is of the sort that EPA ought to pass on in the first instance. While "agency adjudications are generally ill suited to address structural constitutional challenges," *Carr*, 141 S. Ct. at 1360, they are generally well suited to address challenges to agency actions that "involve[] exercise of the agency's discretionary power or . . . allow the agency to apply its special expertise," *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). Nor would it have been futile for United to challenge EPA's accounting methodology in the context of the agency proceeding, as it is well within EPA's authority to reconsider its approach to adjudicating RFS exemption petitions. *See Carr*, 141 S. Ct. at 1361 (noting that "futility exception to exhaustion requirements" applies when adjudicator is "powerless to grant the relief requested"). In a different context, these factors might "tip the scales" in favor of imposing an exhaustion requirement. *Id.* at 1360. But they do not overcome the basic unfairness of preventing a regulated party from litigating an issue that it had neither the obligation nor the opportunity to raise during the agency proceeding.

We therefore hold that United has not forfeited its ability to challenge EPA's method of accounting for RIN sale proceeds.

15

## 2. *Attributing RIN sales to the year of generation was reasonable.*

As a threshold matter, we are not convinced that EPA ever decided to attribute United's RIN sale revenue to the year of generation rather than the year of sale. EPA merely asked United to explain "how United [had] accounted for the financial benefit of its 2018 RFS exemption," including whether United sold "any 2017 or 2018 RINs" and "where in the margin spreadsheet" it had accounted for proceeds from those sales. J.A. 249. Rather than provide narrow clarifying answers to the questions posed, United chose to respond to this request for explanation by submitting an updated financial statement. And it was this amended financial statement that, for the first time, "assume[d] that RINS associated with" a given calendar year "were sold and included in net revenue in" that year. J.A. 415. Thus it was United, not EPA, that decided to attribute RIN sale proceeds to the year of generation. In this respect, EPA's reliance on United's recalculated financial statement seems less a choice of accounting methodology than a decision to take the refinery's most up-to-date submission at face value.

In any event, it was reasonable to determine that attributing RIN sale revenue to the year of generation would provide the best picture of a refinery's economic situation. As our sister circuits have recognized, "EPA retains substantial discretion to decide how to evaluate hardship petitions." *Hermes Consol., LLC v. E.P.A.*, 787 F.3d 568, 575 (D.C. Cir. 2015); *see also Lion Oil Co. v. E.P.A.*, 792 F.3d 978, 983 (8th Cir. 2015). EPA faced a choice between attributing RIN

16

sale proceeds to the year in which the RINs were sold or the year in which the RINs were generated. The former accounting method provides a more accurate depiction of a refinery's actual annual cash flows. But the latter accounting method, which generally attributes the income from RIN sales to the same year in which the refinery incurred costs to generate those RINs, provides a more accurate depiction of the refinery's financial health if it were excluded from the RFS program in the first instance. Either insight strikes us as a defensible way to determine whether compliance with the RFS program "would impose a disproportionate economic hardship" on the refinery, 42 U.S.C. § 7545(o)(9)(A)(ii)(I), as the statute instructs EPA to do, *id.* § 7545(o)(9)(B)(ii). And "it is the agency's prerogative to choose between two competing, justifiable . . . considerations." *Stardyne, Inc. v. N.L.R.B.*, 41 F.3d 141, 148 n.6 (3d Cir. 1994).

At bottom, United's argument hinges on an assumption that the original financial statement that it submitted to EPA—which attributed RIN sale revenues to the year of sale rather than the year of generation—represented the refinery's authentic financial situation without agency meddling. But one could equally argue that the opposite is true. United's original financial statement reflected the fact that United used some of its 2017 and 2018 income to purchase RINs—themselves a creature of EPA regulations—and that United then realized income from selling those RINs in 2019. In this respect, even United's original financial statement reflected the effect of EPA regulations on the firm's financial situation. By contrast, United's updated financial statement reallocated certain line items to approximate the refinery's balance sheet in the

17

absence of the RFS program and thereby provided an insight into the refinery's financial situation in a pre-regulation state of nature. At the very least, United's updated financial statement was no less authentic a depiction of the refinery's financial health than was its original financial statement.

EPA's approach also enabled "apples-to-apples" comparisons among small refineries. Broadly speaking, a small refinery must choose between two strategies for RFS compliance. On the one hand, the refinery can produce or purchase RINs throughout the year with the plan of selling those RINs if and when EPA grants its exemption petition. On the other hand, the refinery can hold off on producing or purchasing RINs and hope to purchase any necessary RINs if and when EPA denies its exemption petition. A refinery adopting this latter strategy would have comparatively higher margins in earlier years due to its lack of RFS compliance costs and lower margins in subsequent years due to its lack of income from RIN sales. A fair and consistent outcome requires EPA to adopt some sort of methodology to standardize profits between otherwise similarly situated small refineries that happen to have adopted divergent compliance strategies. In allocating United's RIN sale proceeds to the year of generation, EPA has done just that.

Nor did attributing RIN sales to the year of generation prevent a fair comparison between United's margins and the overall industry average. To be sure, most refineries are not exempt from the RFS program and so must bear the full cost of RFS compliance each year. Like those non-exempt refineries, United incurred RFS compliance costs during 2017

18

and 2018. But unlike those refineries, United was able to offset its compliance costs by selling 2017 and 2018 RINs after receiving RFS exemptions for those years. EPA reasonably viewed this benefit as a relevant consideration when assessing how United's refining margin—a heuristic for the refinery's overall financial stability—stacked up against the competition.

To the extent that EPA's request for United to account for its proceeds from RIN sales represented a change in agency practice, any such change was permissible. EPA has never promulgated a rule on how to account for RIN sales in calculating refining margins. Nor was EPA obligated to issue such a rule or guidance in advance, as agencies retain "the informed discretion" to implement policy via discrete adjudications rather than broad-based rulemaking. *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 203 (1947).

EPA faced a decision between two possible methods of carrying out its statutory directive to safeguard small refineries from any "disproportionate economic hardship" imposed by the RFS program. 42 U.S.C. § 7545(o)(9)(A)(ii)(I). The agency's choice—to attribute United's RIN sale proceeds to the year in which the RINs were generated—was a reasonable means of accomplishing that task. We ask no more of an agency charged with administering a broad and complex statutory program, and will not disturb EPA's decision.

19

**B. EPA's denial of United's exemption petition was not otherwise arbitrary or capricious.**

*1. EPA need not have considered the effect of the COVID-19 pandemic.*

As the D.C. Circuit has explained, "EPA retains broad discretion to choose which economic factors it will (and will not) consider" in evaluating an RFS exemption petition. *Hermes*, 787 F.3d at 577 (cleaned up). And here, EPA reasonably exercised that discretion by declining to consider an economic factor that postdated the compliance year in question.

Nor did EPA act arbitrarily in declining to follow DOE's recommendation to consider the effect of the COVID-19 pandemic. To be sure, Congress instructed EPA to "consult[]" with DOE when evaluating RFS exemption petitions. 42 U.S.C. § 7545(o)(9)(B)(ii). But as our sister circuits have recognized, EPA need not "blindly adopt" DOE's recommendations. *Ergon-W. Va., Inc. v. E.P.A.*, 896 F.3d 600, 610 (4th Cir. 2018) (quoting *City of Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006)).

*2. EPA reasonably relied on DOE's evaluation of United's hardship petition.*

United argues that EPA mistakenly relied on DOE's analysis of United's business viability. Because this action proceeds against EPA and not against DOE, our review is limited to whether EPA's reliance on DOE's evaluation was arbitrary or capricious, not whether DOE's evaluation of

20

United's hardship petition was itself arbitrary or capricious. *See Ergon-W. Va.*, 896 F.3d at 610. In any event, "the two inquiries overlap" given that the reasonableness of DOE's recommendation necessarily informs our analysis of whether EPA reasonably relied on that recommendation. *City of Tacoma*, 460 F.3d at 75.

United specifically challenges EPA's reliance on three of DOE's determinations. First, United argues that, because it sells fuel in New York and Ohio and not just in Pennsylvania, the agencies should have considered how consumer preferences and fuel regulations in New York and Ohio impact United's business. Second, United argues that the agencies should have given more weight to certain expenses that United incurred from ongoing maintenance projects and an unanticipated shutdown of operations. Third, United objects to the agencies' decision to attribute to United the capital characteristics and business diversification of United's parent corporation.

These arguments are unpersuasive. United does not argue that EPA or DOE "entirely failed to consider" the effect of neighboring state regulations or unexpected business events on a refinery's profits, nor that the capital characteristics of a refinery's parent corporation are a "factor[] which Congress has not intended [EPA] to consider." *State Farm*, 463 U.S. at 43. Rather, United objects to the manner in which the agencies chose to evaluate those factors when considering United's exemption petition. But we may not "substitute [our] judgment for that of the agency" and instead may ask only whether the agency's decision was reasonable. *Citizens to Pres. Overton*

21

*Park*, 401 U.S. at 416. And all of the agency decisions that United challenges satisfy that deferential standard.

First, EPA reasonably ignored the effect of New York and Ohio market preferences and regulations on United's business. DOE has chosen to limit its consideration of state regulations and market preferences to those of the state in which the refinery is located. This decision hardly strikes us as contestable given the administrative complexity that inevitably would ensue if DOE and EPA were to consider the regulations and market preferences of every state in which a refinery's products are sold.

Nor was it unreasonable for DOE and EPA to disregard United's 2019 expenses associated with a capital project and an unplanned shutdown. DOE reasonably determined that United's ongoing upgrades and maintenance were not the sort of short-term crisis that ought to bear on whether a refinery receives an RFS exemption. And DOE justifiably declined to consider the losses from United's brief unplanned shutdown in 2019 after determining that those losses were immaterial. EPA's reliance on these assessments likewise was reasonable.

Lastly, EPA reasonably considered the capital characteristics and business diversification of United's parent corporation when evaluating United's access to capital and lines of business. United is a direct subsidiary of a large private refining company that owns several gas stations, produces other types of fuel along with transportation fuel, and ranks among the largest privately held corporations in the country. Because United "does not have a public debt rating" of its own, DOE sensibly looked to the parent company's credit rating and

22

access to capital. J.A. 421. And because United's parent company has several diversified lines of business, DOE treated United as having access to upstream and downstream lines of business and further determined that United was not "solely dependent on transportation fuel margins." J.A. 422. In short, it was reasonable for DOE and EPA to treat a wholly owned subsidiary as having the capital characteristics and diversified business of its parent company.

## IV.    Conclusion

For the foregoing reasons, we will deny United's petition for review.

23