**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-3094
_____

ZODIAC POOL SYSTEMS LLC,
Petitioner

v.

UNITED STATES DEPARTMENT OF ENERGY
_____

On Petition for Review of a Final Rule
Issued by the United States Department of Energy
_____

Argued:  October 30, 2024

Before:  CHAGARES, <u>Chief</u> <u>Judge</u>, PORTER, and CHUNG, <u>Circuit</u> <u>Judges</u>.

(Filed: January 29, 2025)
_____

Keith J. Coyle  [ARGUED]
Babst, Calland, Clements & Zomnir, P.C.
505 9th Street, Suite 602
Washington, DC 20004

Christina Manfredi McKinley
Mark K. Dausch
Babst, Calland, Clements & Zomnir, P.C.
Two Gateway Center, 603 Stanwix Street,
Floor 8
Pittsburgh, PA 15222

Stefanie Pitcavage Mekilo
Babst, Calland, Clements & Zomnir, P.C.

409 N. 2nd Street, Suite 201
Harrisburg, PA 17101

Counsel for Petitioner Zodiac Pool Systems LLC

Michael S. Raab
Catherine Padhi
Martin Totaro  [ARGUED]
United States Department of Justice
Civil Division
950 Pennsylvania Avenue NW, Room 7712
Washington, DC 20530

Counsel for United States Department of Energy

_____

OPINION[*]
_____

CHAGARES, <u>Chief</u> <u>Judge</u>.

Zodiac Pool Systems LLC ("Zodiac") challenges the Department of Energy's ("DOE") final rule setting energy conservation standards for dedicated purpose pool pump motors. Zodiac argues that the Energy Policy Conservation Act ("EPCA") does not authorize the DOE to issue conservation standards for this class of electric motors, which would render the rule ultra vires and thus, void. Zodiac also claims that, even if the DOE acted within its statutory authority, the rule is arbitrary and capricious for mandating variable-speed functionality for motors that are compatible with pressure cleaner booster pumps, a subclass of pool pumps that operate at only one speed. Because Zodiac expressly petitioned the DOE to issue conservation standards of this nature,

---

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

invoked the EPCA in doing so, and then failed to object to the DOE's authority during rulemaking, we conclude that Zodiac did not preserve its statutory authority argument and decline to entertain it now. In addition, because the DOE's explanation for its variable-speed requirement falls within a zone of reasonableness, we also conclude that the final rule is not arbitrary and capricious. We will therefore deny Zodiac's petition for review.

## I.

We begin with a brief overview of the statutory scheme and rulemaking history relevant to the present petition. This dispute centers on the EPCA, an energy conservation statute signed into law in 1975 as part of a national effort to, among other things, "provide for improved energy efficiency of motor vehicles, major appliances, and certain other consumer products." 42 U.S.C. § 6201(5). In the subsection we will refer to as Part A,[1] the EPCA identifies several categories of energy-consuming "covered products" and lays out the criteria and procedures the Secretary of Energy must follow when "prescribing new or amended standards" for such products. Id. §§ 6292(a), 6295(o).

Congress amended the EPCA in 1978 via the National Energy Conservation Policy Act ("NECPA"), which added Part A-1 and expanded the EPCA's scope to reach industrial equipment. Part A-1 provides that its purpose is "to improve the efficiency of electric motors and pumps and certain other industrial equipment in order to conserve the

---

[1] U.S. Code Title 42, Chapter 77, Subchapter III, Part A – "Energy Conservation Program for Consumer Products Other than Automobiles." See 42 U.S.C. §§ 6291–6309.

energy resources of the Nation." Id. § 6312(a). To that end, the first category of new "covered equipment" added by NECPA is "[e]lectric motors and pumps." Id. § 6311(1)(A). Part A-1 also incorporates large swaths of Part A, including the rulemaking criteria and procedures governing when and how the Secretary may issue new or amended energy conservation standards. Id. § 6316(a).

Of the various classes of "covered equipment" set forth in Part A-1 of the EPCA, dedicated purpose pool pumps ("DPPPs") and their motors are the focus of the rule at issue in this case. DPPPs are essential to swimming pool maintenance systems. Powered by electric motors that often require replacement, DPPPs help circulate pool water through filters, chlorination devices, and heating mechanisms. One subclass of DPPP is the pressure cleaner booster pump ("PCBP"), which supplies water pressure to propel pool cleaning devices (typically equipped with brushes and vacuum-like suction) around the floor and walls of a pool.

Through a "negotiated rulemaking for dedicated-purpose pool pumps," the DOE promulgated energy conservation standards for DPPPs via direct final rule (the "Pool Pump Rule") in early 2017. 82 Fed. Reg. 5650, 5657 (Jan. 18, 2017). During the rulemaking process, the DOE formed a working group of government and industry representatives, including Zodiac (a pool pump and pool pump motor manufacturer), to develop recommended energy conservation standards for DPPPs. See id. Adopting the eventual recommendations of the working group, the DOE divided DPPPs into four categories (including a separate category for PCBPs) and set minimum energy conservation standards for each one. Id. at 5651–52.

4

Not long after the Pool Pump Rule was finalized, industry members urged the DOE to go further by complementing the energy conservation standards for DPPPs with additional standards for DPPP motors. Zodiac submitted a comment to the DOE expressing concerns "that replacement motors are not able to be covered under the DPPP rule," describing the lack of regulation as a "'void' [that] leaves open a significant loophole which could likely drive a considerable amount of replacement motor business to the lower cost, unregulated motors." Appendix ("App.") 925. The DOE took note and held a public meeting on August 10, 2017, to discuss the development of energy conservation standards for DPPP motors with interested parties, including Zodiac.

After the meeting, Zodiac and other industry members continued pushing for additional standards through a joint petition to the DOE, which proposed a set of DPPP motor standards that would "close the replacement motor loophole." App. 240. The joint petition suggested that the DOE issue a set of prescriptive requirements for DPPP motors, including mandatory variable-speed control functionality for all DPPP motors with a total horsepower ("thp") of 1.15 or greater. In other words, more powerful DPPP motors would have to be capable of operating at four or more discrete speeds. With regard to the DOE's purported authority to issue these standards, the joint petition provided: "DOE should adopt our proposal for standards for DPPP motors using the Department's authority over 'electric motors.' . . . DPPP motors are electric motors, and electric motors are already covered equipment." App. 239.

The DOE issued a notice of proposed rulemaking ("NPRM"), which adopted a modified version of the standards requested by Zodiac and others in the joint petition.

See 87 Fed. Reg. 37122 (June 21, 2022).  The NPRM proposed efficiency and design requirements for three classes of motors categorized by thp:  (1) extra-small motors (<0.5 thp) must operate at 69% energy efficiency, (2) small motors (0.5–1.15 thp) must be equipped with variable speed control, and (3) standard motors (1.15–5 thp) must have variable speed control as well.  Id. at 37124, 37127–30.  Mirroring the language in the joint petition, the DOE described its authority to issue standards for DPPP motors as follows:  "EPCA authorizes DOE to regulate the energy efficiency of a number of consumer products and certain industrial equipment. . . . This equipment includes those electric motors that are DPPP motors, the subject of this document."  Id. at 37128 (citing 42 U.S.C. § 6311(1)(A) (defining "covered equipment")).

Multiple industry members objected to the proposed energy standards via public comment.  Although the objections ranged from mechanical to economic, the foremost complaint was that the variable-speed requirement for DPPP motors that could be used in PCBPs was wasteful and unnecessary because PCBPs operate at only one speed.  Most PCBPs use motors in the small thp range of 0.5–1.15 and thus would be subject to the variable-speed mandate, but Zodiac argued that the DOE should create a separate category for PCBP motors, defined as any "motor used for a [PCBP]," exempt from that requirement.  App. 433.  No commenter challenged the DOE's statutory authority to issue energy conservation standards for DPPP motors as a class of covered equipment under the EPCA.

The DOE issued its final rule (the "Motor Rule") with virtually no changes from its NPRM.  88 Fed. Reg. 66966 (Sept. 28, 2023).  As it did in the NPRM, the DOE

grounded its statutory authority in the EPCA's provisions defining covered equipment and establishing the procedures and criteria the DOE must adhere to when promulgating new standards for such equipment. The Motor Rule also clarified an issue of preemption that was left out of the NPRM, providing: "DPPP[] motors are not among the category of electric motors for which Congress established standards and a rulemaking schedule in 42 U.S.C. 6313(b). Thus, State DPPP motor standards are not already preempted as a matter of law." Id. at 66971. State regulations would instead only be preempted "upon the compliance date for Federal standards in th[e] final rule." Id. at 66972. In response to objections to the categorical variable-speed requirement for all motors above 0.5 thp, the DOE offered two primary justifications. First, the DOE highlighted that "there are no physical or technological distinguishing factors in a DPPP motor that could be used to identify a particular end-use DPPP application (e.g., PCBP, self-priming, non-self-priming). If sized correctly, a given DPPP motor could serve any of the DPPP applications discussed in th[e] rulemaking." Id. at 66984. Second, the DOE explained that PCBPs still need to be adjusted to the optimal speed for their pool. Rather than finding that optimal speed by using an excessively powerful motor and adjusting the pressure downstream through physical relief valves that waste energy, the DOE reasoned that it is more efficient to adjust pump speed at the motor itself. See id. at 66996 ("[B]ecause of the cubic relationship between pump speed and power, reducing the speed of a pump by a small amount can yield large energy savings.").

Zodiac, frustrated with the variable-speed requirement for motors compatible with PCBPs, timely petitioned this Court for review of the DOE's Motor Rule.

## II.[2]

The Administrative Procedure Act ("APA") provides that courts must "decide all relevant questions of law," 5 U.S.C. § 706, which means this Court exercises plenary review over the legal question of whether the EPCA authorizes the DOE to promulgate energy conservation standards for DPPP motors, see Loper Bright Enters. v. Raimondo, 144 S. Ct. 2244, 2261–62 (2024). As for the arbitrary and capricious challenge, however, the Court's review is both narrow and deferential. Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins., 463 U.S. 29, 43 (1983). Although the Court must ensure that the agency has articulated "a rational connection between the facts found and the choice made," an agency explanation of "less than ideal clarity" should not be invalidated if "the agency's path may reasonably be discerned." Id. (first quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962); then quoting Bowman Transp. Inc. v. Arkansas-Best Freight Sys., 419 U.S. 281, 286 (1974)).

## III.

Zodiac argues that the Motor Rule is unlawful for at least one of two reasons. It argues first that the EPCA does not authorize the DOE to issue energy conservation standards for DPPP motors despite qualifying as "covered equipment." Second, Zodiac argues that even if the DOE were authorized to promulgate energy conservation standards for these motors, the Motor Rule is arbitrary and capricious for failing to define an

---

[2] We have jurisdiction under 42 U.S.C. § 6306(b)(2). Because Zodiac is an LLC organized under Delaware law, this Circuit is the proper venue for Zodiac's petition. See id. § 6306(b)(1).

additional subclass of "PCBP motors" exempt from the variable-speed requirement. We will address these arguments in turn below.

A.

While the parties have offered many thoughtful arguments as to the DOE's statutory authority and the proper interpretation of the EPCA, the Court cannot ignore the procedural hurdle impacting our ability to consider the merits of this issue in the first place. Neither Zodiac nor anyone else objected to the Motor Rule on the basis that the DOE lacked authority under the EPCA to issue energy conservation standards for DPPP motors. To the contrary, Zodiac argued in favor of the DOE's authority to do so. By all indications then, Zodiac failed to preserve its statutory authority argument.

Issue preservation doctrine generally requires litigants to present the arguments they wish to raise on appeal to the trial court or, in this case, regulatory agency whose decision they seek to challenge. The same issue preservation rules that avoid the unfair surprise of a "'revers[al] on grounds that were never urged or argued' before [a] trial court[]," Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist., 877 F.3d 136, 146 (3d Cir. 2017) (quoting Caisson Corp. v. Ingersoll-Rand Co., 622 F.2d 672, 680 (3d Cir. 1980)), have historically precluded petitioners like Zodiac from advancing an "argument [that] was not raised during the rulemaking process" as well, Sw. Pa. Growth All. v. Browner, 121 F.3d 106, 111–12 (3d Cir. 1997) (Alito, J.). Issue preservation "is a rule of discretion, rather than jurisdiction," but this Court tends to exercise that discretion to foreclose unraised arguments unless there are "special circumstances" that justify departing from this "general rule." State of N.J. Dep't of Educ. v. Hufstedler, 724 F.2d

9

34, 36 n.1 (3d Cir. 1983), rev'd on other grounds sub nom. Bennett v. New Jersey, 470 U.S. 632 (1985); see also Ctr. for Biological Diversity v. EPA, 75 F.4th 174, 183 (3d Cir. 2023) (declining to entertain argument in APA challenge when petitioner "ma[de] no mention of the objection in question" during rulemaking).

This principle is well established in our precedent. In this Court's decision in Southwestern Pennsylvania Growth Alliance v. EPA, for example, we declined to review a legal issue that was not raised during rulemaking. 121 F.3d at 113. The petitioner in that case challenged an EPA final rule denying Pennsylvania's request to redesignate a geographic region from a "nonattainment area for ozone" to one with "attainment status." Id. at 110. The petitioner raised an argument of pure statutory interpretation: the EPA violated its mandatory duty under the Clean Air Act to respond to the redesignation request within 18 months and was prohibited from considering ozone data outside of that 18-month period. Id. at 111. Yet this "intricate statutory interpretation argument" was never presented to the EPA during the notice-and-comment period, and we held that it was "inappropriate to consider this new issue" for the first time on appeal. Id. at 112. We are bound by this decision, and, contrary to Zodiac's suggestion, the Supreme Court's recent abrogation of Chevron does not call our precedent into question, as issue preservation in review of agency action long predates Chevron. Compare Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), overruled by Loper Bright Enters., 144 S. Ct. 2244, with United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37 (1952)), and Hufstedler, 724 F.2d at 36 n.1 (citing Singleton v. Wulff, 428 U.S. 106, 120 (1976)).

There is no sound basis to address the merits of Zodiac's argument that the DOE lacked authority to issue regulations Zodiac requested itself. Zodiac argues in this case that the DOE is not authorized to prescribe energy conservation standards for technology just because the EPCA classifies it as covered equipment. During rulemaking, however, Zodiac not only failed to raise that argument, but also took the opposite position. The Court is mindful that at times we have overlooked a failure to preserve a purely legal argument, see, e.g., La. Forestry Ass'n v. Sec'y U.S. Dep't of Labor, 745 F.3d 653, 669 n.14 (3d Cir. 2014), but we would break no new ground by refusing to hear a "statutory interpretation argument [raised] for the first time on appeal" that could have been made during rulemaking, Sw. Pa. Growth Alliance, 121 F.3d at 112. On the record before us, we see no compelling reason to entertain a statutory authority argument raised by the same petitioner who had asked the agency to issue the rule. See S. Coast Air Quality Mgmt. Dist. v. EPA, 472 F.3d 882, 891 (D.C. Cir. 2006) ("[A] party that presents a winning opinion before the agency cannot reverse its position before this court.").

Zodiac protests that its failure to preserve should be excused because the DOE did consider its statutory authority and because the DOE reversed its position by disclaiming the application of 42 U.S.C. § 6313 in its final rule. But both arguments fall flat. True enough, courts often consider whether a potentially unpreserved issue was one that the agency "did not have the opportunity to address in the first instance," United Refining Co. v. EPA, 64 F.4th 448, 456–57 (3d Cir. 2023), but we are not persuaded that the DOE was (or should have been) on notice of the specific objections Zodiac raises for the first time in this Court, see Koretoff v. Vilsack, 707 F.3d 394, 398 (D.C. Cir. 2013)

11

("[A]gencies have no obligation to anticipate every conceivable argument about why they might lack . . . statutory authority."). Nor do we find support in the record for Zodiac's accusation of agency flip-flopping. The DOE's clarification regarding Section 6313, which related exclusively to whether state laws were already preempted, does not excuse Zodiac's decision not to object to the DOE's authority to issue the rule. If there had been a sua sponte reversal of position on the DOE's claim of statutory authority, that would undoubtedly raise concerns about whether Zodiac had a reasonable opportunity to present its precise objections. See Riffin v. Surface Transp. Bd., 733 F.3d 340, 343 (D.C. Cir. 2013). Yet no such reversal occurred, as evidenced by the virtually identical "Authority" sections of the NPRM and final Motor Rule. Compare 87 Fed. Reg. at 37128–29 (citing, inter alia, 42 U.S.C. §§ 6311(1)(A), 6313, 6316(a), 6295), with 88 Fed. Reg. at 66971–72 (citing, inter alia, 42 U.S.C. §§ 6311(1)(A), 6316(a), 6295). If any party has reversed its position, it is Zodiac, and for that reason we decline to take up Zodiac's unpreserved challenge.

B.

On its arbitrary and capricious challenge, Zodiac faces a high hurdle given the deference we must afford to the DOE. See State Farm, 463 U.S. at 43. In an attempt to characterize the Motor Rule's variable-speed mandate as arbitrary and capricious, Zodiac advances several arguments, but none have merit.

Zodiac first argues that the DOE failed to explain reasonably why it did not create a separate category for PCBP motors, but this is belied by any plain reading of the Motor Rule. The Motor Rule provides that DPPP motors were categorized by thp because

12

"[h]orsepower is a critical performance attribute of a DPPP motor," 88 Fed. Reg. at 66984, which Zodiac does not contest (nor could it seriously do so, given its recommendation to divide DPPP motors by thp in the joint petition). Zodiac also has no answer to the DOE's finding, supported by the record, that DPPP motors of the same size can be used for multiple DPPP end-uses, including PCBPs, so a DPPP motor cannot be a "PCBP motor" until and unless it is in fact installed in a PCBP. And even if the DOE were for some reason required to consider end-use applications (notwithstanding the fungibility of the motors themselves), the Motor Rule speaks to this too, noting that PCBP applications make up a miniscule fraction of DPPP motor uses.

Zodiac also contends that the DOE failed to consider a panoply of important economic factors, but again the Motor Rule itself tells another story. Zodiac claims that the DOE failed to consider the Motor Rule's economic impact on pump manufacturers, but the DOE explicitly analyzed the potential increased costs for pump manufacturers as the main clients of DPPP motor manufacturers in the distribution chain. See 88 Fed. Reg. at 66992. Zodiac also claims that the DOE failed to consider a particular study on an economic factor known as the "payback period," but the DOE acknowledged Zodiac's preferred study and explained why the DOE considered it less persuasive compared to other studies which, for example, "analyze[d] a larger consumer sample." 88 Fed. Reg. at 67003; see also Newspaper Ass'n of Am. v. Postal Regul. Comm'n, 734 F.3d 1208, 1216 (D.C. Cir. 2013) ("When, as here, an agency is making 'predictive judgments about the likely economic effects of a rule,' we are particularly loath to second-guess its analysis." (quoting Nat'l Tel. Coop. Ass'n v. FCC, 563 F.3d 536, 541 (D.C. Cir. 2009)).

13

Zodiac's contention that the DOE failed to consider the relationship between the Motor Rule and the prior Pool Pump Rule, fares no better.  See 88 Fed. Reg. at 67010–11.

In its final effort to paint the Motor Rule as arbitrary and capricious, Zodiac insists that "PCBP motors" are special because PCBPs operate at one speed, but the DOE cogently explained in its Motor Rule why variable-speed functionality is (at least) a reasonable requirement even for DPPP motors used in single-speed applications.  The DOE's explanation is not difficult to grasp:  even if a pump will only operate at one speed, setting the speed that is sufficient but not greater than necessary at the <u>motor</u> is more efficient than setting a motor to its maximum speed and diverting (that is, wasting) any excess pressure through downstream modifications such as "pressure relief valve[s]" or "pressure discs."  88 Fed. Reg. at 66976, 66991.  With no response to this straightforward explanation, Zodiac instead unpersuasively argues that the DOE failed to consider whether variable-speed motors lessen the utility or performance of PCBPs (an issue that was never raised in comments but is still addressed in the Motor Rule) or that the DOE's definition of variable-speed functionality is unjustifiable (despite Zodiac's parent company urging the DOE to adopt the exact industry standard Zodiac now challenges).  At minimum, the DOE's Motor Rule falls "within a zone of reasonableness," <u>FCC v. Prometheus Radio Project</u>, 592 U.S. 414, 423 (2021), and demonstrates "a rational connection between the facts found and the choice[s] made," <u>State Farm</u>, 463 U.S. at 43.  That is sufficient for the Court to hold that the Motor Rule is not arbitrary and capricious.

14

## IV.

For the foregoing reasons, we will deny Zodiac's petition for review.